1  PATRICIA L. GLASER - State Bar No. 55668
   pglaser@glaserweil.com
2  ERICA J. VAN LOON - State Bar No. 227712
   evanloon@glaserweil.com
3  REX HWANG - State Bar No. 221079
   rhwang@glaserweil.com
4  NICHOLAS E. HUSKINS - State Bar No. 299133
   nhuskins@glaserweil.com
5  GLASER WEIL FINK HOWARD
     AVCHEN & SHAPIRO LLP
6  10250 Constellation Boulevard, 19th Floor
   Los Angeles, California 90067
7  Telephone:  (310) 553-3000
   Facsimile:  (310) 556-2920
8
   *Attorneys for Defendants*
9

10              UNITED STATES DISTRICT COURT

11             SOUTHERN DISTRICT OF CALIFORNIA

12

13  ROBERT ALEXANDER KASEBERG,          CASE NO.: 15-CV-01637-JLS-DHB

14                 Plaintiff,           Hon. Janis L. Sammartino

15  v.                                  **MEMORANDUM OF POINTS
                                        AND AUTHORITIES IN SUPPORT
16  CONACO, LLC; TURNER                 OF DEFENDANTS' MOTION FOR
    BROADCASTING SYSTEM; TIME           SUMMARY JUDGMENT AND/OR
17  WARNER, INC.; CONAN O'BRIEN;        PARTIAL SUMMARY
    JEFF ROSS; MIKE SWEENEY; DOES       JUDGMENT OR, IN THE
18  1-50, inclusive,                    ALTERNATIVE, SUMMARY
                                        ADJUDICATION**
19                 Defendants.
                                        **[PUBLIC VERSION]**
20
                                        DATE:          April 6, 2017
21                                      TIME:          1:30 p.m.
                                        COURTROOM:     4A
22

23

24

25

26

27

28

Glaser Weil

# **TABLE OF CONTENTS**

                                                                                    Page

I.     INTRODUCTION ........................................................................ 1

II.    STATEMENT OF FACTS .......................................................... 2

       A.    The Parties ...................................................................... 2

       B.    *Conan*'s Creation Process ............................................... 3

       C.    The Jokes At Issue ......................................................... 4

       D.    Kaseberg's Joke Theft Accusation .................................. 7

III.   LEGAL STANDARD ................................................................ 8

IV.    ARGUMENT ............................................................................ 8

       A.    Kaseberg Failed To Register The Tom Brady And UAB Jokes,
             Which Is A Fundamental Prerequisite To Filing Suit ........... 8

       B.    Kaseberg Cannot Prove Copyright Infringement ................. 9

             1.    Kaseberg Lacks Any Evidence Of Direct Copying ......... 10

             2.    Kaseberg Cannot Establish Access ............................ 10

                   a.    The *Conan* Defendants Created The Delta And
                         Washington Monument Jokes First ...................... 10

                   b.    Kaseberg Lacks Any Significant, Affirmative, And
                         Probative Evidence To Establish Access ............... 11

             3.    Kaseberg's Copyright Is "Thin" And He Cannot Establish
                   The Jokes At Issue Are Virtually Identical ................. 13

                   a.    Kaseberg's Jokes Only Warrant "Thin" Protection ....... 14

                   b.    Stripped of Non-Protectable Elements, The
                         Expression In The Parties' Jokes Are Not Virtually
                         Identical .................................................... 15

       C.    The *Conan* Defendants' Independently Created The Jokes At Issue . 20

       D.    Defendants Did Not Willfully Infringe Kaseberg's Copyrights ........ 25

V.     CONCLUSION ........................................................................ 25

i

MEMORANDUM OF POINTS AND AUTHORITIES ISO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND/OR
PARTIAL SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION

1303011                                                                      15-cv-01637-JLS-DHB

# TABLE OF AUTHORITIES

Page

# FEDERAL CASES

*Apple Computer, Inc. v. Microsoft Corp.*,
  35 F.3d 1435 (9th Cir. 1994) ................................................................... 13, 14, 15

*Arpin v. Santa Clara Valley Transp. Agency*,
  261 F.3d 912 (9th Cir. 2001) ............................................................................... 8

*Art Attacks Ink, LLC v. MGA Entm't, Inc.*,
  581 F.3d 1138 (9th Cir. 2009) ........................................................................... 12

*Bernal v. Paradigm Talent and Literary Agency*,
  788 F. Supp. 2d 1043 (C.D. Cal. 2010) ............................................................. 11

*Bldg. Graphics, Inc. v. Lennar Corp.*,
  708 F.3d 573 (4th Cir. 2013) ............................................................................. 11

*Cavalier v. Random House, Inc.*,
  297 F.3d 815 (9th Cir. 2002) ............................................................................. 13

Celotex Corp. v. Catrett,
  477 U.S. 317 (1986) ............................................................................................ 8

*Chafir v. Carey*,
  2007 WL 2702211 (S.D.N.Y. Sept. 17, 2007) ................................................... 11

*Christian v. Mattel, Inc.*,
  286 F.3d 1118 (9th Cir. 2002) ........................................................................... 20

*Cosmetic Ideas, Inc. v. IAC/Interactivecorp.*,
  606 F.3d 612 (9th Cir. 2010) ............................................................................... 9

*Data East USA, Inc. v. Epyx, Inc.*,
  862 F.2d 204 (9th Cir. 1988) ............................................................................. 16

*Dr. Seuss Enter., L.P. v. Penguin Books USA, Inc.*,
  109 F.3d 1394 (9th Cir. 1997) ........................................................................... 13

*Ets-Hokin v. Skyy Spirits, Inc.*,
  323 F.3d 763 (9th Cir. 2003) ............................................................................. 14

*Feist Publ'n, Inc. v. Rural Tel. Serv. Co., Inc.*,
  499 U.S. 340 (1991) ........................................................................................... 14

*Foxworthy v. Custom Tees, Inc.*,
  879 F. Supp. 1200 (N.D. Ga. 1995) ................................................................... 15

Glaser Weil

*Funky Films, Inc. v. Time Warner Entm't Co., L.P.*,
 462 F.3d 1072 (9th Cir. 2006) .................................................................... 9, 10, 16

*Granite Music Corp. v. United Artist Corp.*,
 532 F.2d 718 (9th Cir. 1976) ..................................................................... 20

*Idema v. Dreamworks, Inc.*,
 162 F. Supp. 2d 1129 (C.D. Cal. 2001) ...................................................... 14

*Loomis v. Cornish*,
 2013 WL 6044345 (C.D. Cal. Nov. 13, 2013) .......................................... 12

*Mattel, Inc. v. MGA Entm't, Inc.*,
 616 F.3d 904 (9th Cir. Cal. 2010) ............................................................. 15

*Meta-Film Assoc., Inc. v. MCA, Inc.*,
 586 F. Supp. 1346 (C.D. Cal. 1984) .......................................................... 11

*Mory v. City of Chula Vista*,
 2010 WL 3748813 (S.D. Cal. Sept. 24, 2010) ........................................... 8

*Narell v. Freeman*,
 872 F.2d 907 (9th Cir. 1989) ..................................................................... 15

*Olander Enters., Inc., v. Spencer Gifts, LLC*,
 812 F. Supp. 2d 1070 (C.D. Cal. 2011) ...................................................... 9

*Payne v. Anvil Knitwear, Inc.*,
 2007 WL 1953438 (C.D. Cal. June 27, 2007), *aff'd*, 293 F. App'x 475 (9th
 Cir. 2008) ................................................................................................... 10

*Rice v. Fox Broad. Co.*,
 330 F.3d 1170 (9th Cir. 2003) ................................................................... 13

*Shaw v. Lindheim*,
 919 F.2d 1353 (9th Cir. 1990) .............................................................. 13, 14

*Stabile v. Paul Smith Ltd.*,
 137 F. Supp. 3d 1173 (C.D. Cal. 2015) ..................................................... 12

*Tarin v. Cnty. of Los Angeles*,
 123 F.3d 1259 (9th Cir. 1997) ..................................................................... 8

*Three Boys Music Corp. v. Bolton*,
 212 F.3d 477 (9th Cir. 2000) ..................................................................... 11

*UMG Recordings, Inc. v. Disco Azteca Distrib., Inc.*,
 446 F. Supp. 2d 1164 (E.D. Cal. 2006) ..................................................... 25

*Washington Shoe Co. v. A-Z Sporting Goods Inc.*,
 704 F.3d 668 (9th Cir. 2012) ..................................................................... 25

iii

MEMORANDUM OF POINTS AND AUTHORITIES ISO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND/OR
PARTIAL SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION

1303011

15-cv-01637-JLS-DHB

**<u>FEDERAL STATUTES</u>**

17 U.S.C. § 411(a) ................................................................................................ 8

17 U.S.C. § 504(c)(2) ........................................................................................ 25

**<u>OTHER AUTHORITIES</u>**

Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 2.13 (Mathew
    Bender rev. ed. 2016) ................................................................................ 14

Glaser Weil

MEMORANDUM OF POINTS AND AUTHORITIES ISO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND/OR
PARTIAL SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION

1303011

1   Defendants Conaco, LLC, Conan O'Brien, Jeff Ross, and Mike Sweeney
2   ("*Conan* Defendants"), Turner Broadcasting System, Inc., Time Warner Inc. ("Turner
3   Defendants") (collectively, "Defendants"), hereby submit this memorandum of points
4   and authorities in support their Motion For Summary Judgment And/Or Partial
5   Summary Judgment Or, In The Alternative, Summary Adjudication, as follows:

6   ## I.   INTRODUCTION

7   *Conan* is a popular late-night talk show that airs on TBS. Like many other late-
8   night talk shows, *Conan* starts with a monologue featuring short "monologue-style"
9   jokes. A monologue-style joke generally includes a factual setup based on a trending
10  news or media story, followed by a comedic punchline. *Conan*'s monologue is
11  developed through a thorough creative process which encompasses a team of writers
12  and involves multiple content submissions and rounds of review.

13  Plaintiff Robert Alexander Kaseberg ("Kaseberg") ████████████████
14  ██████████████████████████████████████████████████████
15  ████████████████████████████████████████████████████████████
16  ████████████████████████████████████████████████████████
17  ████████████████████████████████████████████████████████████
18  ██████████████████████████████████████████████████████
19  ████████████████████████████████████████████████████

20  According to Kaseberg, as he was watching *Conan* in early 2015, he noticed
21  similarities between his jokes and *Conan*'s monologue jokes. Subsequently, Kaseberg
22  called Defendant Mike Sweeney, then the head writer at *Conan*, and accused *Conan*
23  of using his material. During the call, Kaseberg unsuccessfully tried to leverage his
24  accusations into a job writing for *Conan*. Months later, Kaseberg filed this lawsuit
25  against Defendants alleging copyright infringement as to five of his jokes.

26  Kaseberg's copyright infringement claims are completely frivolous. First,
27  Kaseberg failed to register two of his five asserted copyrights, and therefore lacks
28  standing to assert copyright infringement as to these two jokes. Second, Kaseberg

must establish copying to prove copyright infringement. But two of the accused jokes were created by *Conan*'s writers **before** Kaseberg published his jokes for the first time. Thus, as a matter of law and logic, Defendants could not have copied jokes they created first, and could not have infringed these two jokes. Third, Kaseberg lacks *any* evidence of direct infringement, as well as *any* evidence to establish Defendants' access to Kaseberg's jokes. In fact, Kaseberg's access theory is based solely on the fact that he posted his jokes online, which is legally insufficient to establish access. Fourth, as any similarities between them are limited to unprotectable facts and ideas, Kaseberg cannot establish the requisite level of similarity necessary to sustain an infringement claim. Specifically, Kaseberg's jokes are composed almost entirely of unprotectable elements. Thus, they are entitled to "thin" protection at best, which only protects against virtual copying. And an objective comparison of the jokes demonstrates they are not virtually identical, and thus, cannot support an infringement claim. Fifth, the *Conan* Defendants independently created their jokes, which is a complete defense to infringement. Finally, the Court should grant summary adjudication as to Defendants' nonwillfulness, since Kaseberg failed to present any evidence that any alleged infringement was willful.

## II.    STATEMENT OF FACTS

### A.    The Parties

*Conan* is a late-night talk show that airs on TBS. UF 1. Conan O'Brien created and hosts *Conan*. UF 2. Jeff Ross is *Conan*'s executive producer. UF 3. Mike Sweeney was *Conan*'s head writer during all times relevant to this lawsuit. UF 4. Turner Broadcasting System, Inc. owns and operates the network TBS. UF 5. Time Warner Inc. is Turner's ultimate parent company. UF 6.



UF 7. ███████

███████████████████████████████████████████████

███████ UF 8. ██████████████████████

███████████ UF 9.

Glaser Weil

## B.     *Conan*'s Creation Process

*Conan* airs Monday through Thursday, over forty weeks each year. UF 1. Each show opens with O'Brien delivering a monologue to a live studio audience. UF 10. Four monologue writers and O'Brien create *Conan*'s monologues. UF 11.

In preparing the monologue, the writers follow a specific daily routine. To begin, the monologue writers typically spend the first hour of each workday crafting premises from the day's news headlines. UF 12. Each writer visits their own short list of specific, online news websites to source their premises. UF 13. Premises crafted by monologue interns are also circulated each morning. UF 14. The interns are required to indicate the website from which they sourced the premise with their submissions. UF 15. Notably, the monologue writers do not research social media profiles, conduct general google searches, or review content on other comedians' blogs, social media, or personal websites for their premise research. UF 16. Following the premise research, the writers independently email their first batch of monologue jokes to the monologue writers' assistant, Danielle Weisberg. UF 17. Weisberg then compiles all the writer submissions in a document called "Batch 1" and distributes a hard copy of the document to the monologue writers. UF 18.

Around noon, the monologue writers and Weisberg meet to review Batch 1. UF 19. During this meeting, the monologue writers edit the jokes to fix grammatical errors and make stylistic improvements. UF 20. They also remove redundant jokes created by different monologue writers (a near-everyday occurrence) and jokes that otherwise do not work. UF 21. Following these edits, the revised Batch 1 jokes are sent to O'Brien for review. UF 22. O'Brien makes minor edits, approves jokes for the monologue, and identifies topics he wants the writers to keep working on. UF 23.

Between 1:00 and 1:45 p.m., the writers receive O'Brien's notes on Batch 1, and draft more jokes for Batch 2, focusing on the topics identified by O'Brien. UF 24. Weisberg circulates additional intern premises around this time. UF 25.

After rehearsal (between 2:00 and 2:45 p.m.), O'Brien meets with his writers to

3

MEMORANDUM OF POINTS AND AUTHORITIES ISO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND/OR
PARTIAL SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION

1303011                                                                                            15-cv-01637-JLS-DHB

review pre-approved Batch 1 and new Batch 2 jokes, and selects which jokes to move forward with. UF 26. The selected jokes are sent to *Conan's* research department to vet factual accuracy and *Conan*'s producers to vet sponsorship issues. UF 27.

By 3:40 p.m., the writers create a final batch of jokes for Batch 3, which is again submitted for *Conan*'s review. UF 28. Batch 3 includes the previously approved jokes, and new jokes the writers created since the 2:30 p.m. meeting. UF 29.

At 3:45 p.m., O'Brien, the monologue writers, Weisberg, O'Brien's on-air "sidekick" Andy Richter, the show's head writer, Ross, and a few other staff members meet to finalize the show's monologue. UF 30. Mr. O'Brien then reads all approved monologue jokes off cue cards, including any from Batch 3. UF 31. The group decides which of the approved jokes make it into the finalized monologue, and in what order. UF 32. At this stage, previously approved jokes may still be tweaked or discarded – particularly if anyone has seen or heard a similar joke done elsewhere. UF 33. The show begins taping at 4:30 p.m., just after this meeting ends. UF 34.

Each writer drafts monologue jokes from their own office, and independently submits their jokes to Weisberg throughout the day. UF 35. At every stage of review, the jokes are presented anonymously. UF 36. This anonymous process is by design, so that the jokes are judged on their merits alone. UF 37. Because the monologue jokes are written, submitted, and eventually used on the show without attribution to any particular writer, the quality or quantity of the output by a particular writer is not measured, and does not bear on a writer's standing at the show. UF 38.

## C. The Jokes At Issue

**The Delta Joke:** On January 14, 2015, at 4:14 p.m., Kaseberg posted the following "Delta Joke" on his blog: "A Delta flight this week took off from Cleveland to New York with just two passengers. And they fought over control of the armrest the entire flight." UF 39. Kaseberg purportedly registered this joke with the Copyright Office on March 10, 2015. UF 40. ███████████████████████

████████████████████████████████████████████████████

1 ██████████████ UF 41.

2     The *Conan* Defendants' accused Delta Joke reads as follows: "This never

3 happens anymore. This is a strange story. On Monday, a Delta flight from Cleveland

4 to New York took off with just two passengers. Two passengers on the whole plane.

5 Yet somehow, they spent the whole flight fighting over the armrest. As if they

6 wouldn't sit together, but they did. Everyone's ok." UF 42. This joke aired on January

7 14, 2015. UF 43. Importantly, the *Conan* monologue writer who created the joke,

8 Josh Comers, submitted it via email on January 14, 2015 at 11:33 a.m. UF 44. Thus,

9 the *Conan* Defendants created their Delta Joke nearly five hours before Kaseberg first

10 posted his version of the joke. Also, Kaseberg published his Delta Joke just sixteen

11 minutes before the January 14, 2015 *Conan* episode began taping, after all jokes for

12 that show were vetted and finalized. UF 33-34, 91.

13     **The Washington Monument Joke:** Kaseberg posted the following

14 "Washington Monument Joke" to Twitter on February 17, 2015 at 7:21 a.m. and to

15 his blog at 11:20 a.m.: "The Washington Monument is ten inches shorter than

16 previously thought. You know the winter has been cold when a monument suffers

17 from shrinkage." UF 45. Kaseberg's effective registration date for this joke is

18 December 11, 2015. UF 46.

19     The *Conan* Defendants' accused Washington Monument Joke reads as follows:

20 "Yesterday surveyors' announced that the Washington Monument is ten inches

21 shorter than what's been previously recorded. Yeah. Of course, the monument is

22 blaming the shrinkage on the cold weather. Penis joke." UF 47. This joke aired on

23 February 17, 2015. UF 48. Brian Kiley submitted this joke via email on February 17,

24 2015 at 1:23 p.m. UF 49.

25     Significantly, O'Brien previously told a version of the Washington Monument

26 Joke during the January 9, 2014 monologue, over a year before Kaseberg created his

27 version of the Washington Monument joke. UF 50. The premise of *Conan*'s 2014

28 Washington Monument Joke reads as follows: "The East Coast is starting to warm up.

*Glaser Weil*

5

MEMORANDUM OF POINTS AND AUTHORITIES ISO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND/OR PARTIAL SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION

1303011                                                                                                                    15-cv-01637-JLS-DHB

That's the good news. But it got very cold there for a while, especially in Washington D.C. Record low temperatures this week. Check out this time-lapse footage of the cold front hitting the Washington Monument." Following this setup, a video clip aired depicting the Washington Monument shrinking. UF 51.

**The UAB Joke:** On December 2, 2014, Kaseberg posted the following "UAB Joke" on his blog: "The University of Alabama-Birmingham is shutting down its football program. To which the Oakland Raiders said; 'Wait, so you can do that?'" UF 52. Kaseberg did not produce a copyright registration for this joke. UF 53.

The *Conan* Defendants' accused "UAB Joke" reads: "Big news in sports. University of Alabama-Birmingham has decided to discontinue its football team. Yeah. When they heard this news, New York Jets fans said, 'Wait, can you do that? It's something you can do?'" UF 54. This joke aired on *Conan* on December 3, 2014. UF 55. Kiley submitted this joke via email on December 3, 2014 at 11:32 a.m. UF 56. Notably, O'Brien has used a variation of the punchline, "Wait, you can do that?" in his monologues for years. UF 57. Since 2013, various *Conan* monologue writers submitted over twenty-five jokes with some variation of this punchline. UF 58.

**The Tom Brady Joke:** Kaseberg posted the following "Tom Brady Joke" to Twitter on February 3, 2015 at 8:49 a.m., and to his blog at 9:02 a.m.: "Tom Brady said he wants to give his MVP truck to the man who won the game for the Patriots. So enjoy that truck, Pete Carroll." UF 59. Kaseberg did not produce a copyright registration for this joke. UF 60.

The *Conan* Defendants' accused Tom Brady Joke reads as follows: "Tom Brady said he wants to give the truck that he was given as Super Bowl MVP, give the truck to the guy who won the Super Bowl for the Patriots. Which is very nice. I think that's nice. I do. Yes. So Brady's giving his truck to Seahawks coach Pete Carroll." UF 61. This joke aired on *Conan* on February 4, 2015. UF 62. Kiley submitted this joke via email on February 3, 2014 at 3:14 p.m. UF 63.

**The Bruce Jenner Joke:** Kaseberg posted the following "Bruce Jenner Joke"

6

to his blog on June 9, 2015 at 11:05 a.m. and to Twitter at 11:31 a.m.: "Three towns, two in Texas, one in Tennessee, have streets named after Bruce Jenner and now they have to consider changing them to Caitlyn. And one will have to change from a Cul-De-Sac to a Cul-De-Sackless." UF 64. Kaseberg's effective registration dates for this joke are June 26, 2015 and September 8, 2015. UF 65.

The *Conan* Defendants' accused Bruce Jenner Joke reads as follows: "Some cities that have streets named after Bruce Jenner are trying to change the streets' names to Caitlyn Jenner. If you live on Bruce Jenner cul-de-sac it will now be cul-de-no-sack." UF 66. This joke aired on *Conan* on June 9, 2015. UF 67. Rob Kutner submitted this joke via email on June 9, 2015 at 1:34 p.m. UF 68.

**D.    Kaseberg's Joke Theft Accusation**

██████████████████████████████████████████████████████████ UF 69. In fact, he wrote about his desire to work at *Conan* as early as 2010. UF 70.

████████████████████████████████████████████████████████████ ██████████████████████████████████ UF 71. ████████████████████ ████████████████████████████████████ UF 72. ██████████████ ████████████████████████████████████████████████ ████████████████████ UF 73. ████████████████████████████████ ██████████████████████ UF 74.

Relevant to this lawsuit, Kaseberg purportedly started noticing similarities between his jokes and the *Conan* Defendants' jokes when the Delta Joke aired. UF 75. After *Conan*'s Delta Joke aired, he tweeted at Defendant Sweeney saying: "95% sure [he] had a joke from [his] blog used on the show. I'm not upset, [but] would like the opportunity to contribute jokes." UF 76. Three days after the Tom Brady Joke aired, Kaseberg tweeted at one of *Conan*'s sketch writers that the "Brady joke was on my blog on Feb. 3 and on the monologue on Feb. 4. Any chance I can send jokes on my own as a freelancer?" UF 77.

Then, after seeing the *Conan* Defendants' Washington Monument Joke on

*Conan*, Kaseberg began calling the show about the alleged similarities, and eventually reached Sweeney. UF 78. During this call, Kaseberg *again* expressed an interest in working for *Conan* in some capacity. Sweeney rejected Kaseberg's request for work. UF 79. Following the call, Kaseberg again tweeted at Sweeney, saying "Thanks for taking my call. Last thing I wanted was to sound accusing. If there is any way I can contribute jokes, let me know." UF 80. Approximately five months after that tweet, Kaseberg filed this lawsuit accusing *Conan* of stealing four of his jokes. UF 81. ███

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████ UF 82.

## III.   LEGAL STANDARD

A moving party is entitled to summary judgment when the evidence, viewed in the light most favorable to the nonmoving party, demonstrates a lack of any genuine issue as to any material fact. *Tarin v. Cnty. of Los Angeles*, 123 F.3d 1259, 1263 (9th Cir. 1997). A court may grant summary adjudication as to certain facts, issues, or applicable legal theories, deeming them established for trial. *Mory v. City of Chula Vista*, 2010 WL 3748813, at *2 (S.D. Cal. Sept. 24, 2010). The movant bears the burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). That burden may be met by showing that there is an absence of evidence to support the nonmovant's case. *Id.* at 325. Once the movant has met its initial burden, the non-moving party must go beyond the pleadings and identify specific facts that show a genuine issue for trial. *See id.* at 323-34. Only genuine, material disputes will properly preclude the entry of summary judgment. *Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 919 (9th Cir. 2001).

## IV.   ARGUMENT

### A.   Kaseberg Failed To Register The Tom Brady And UAB Jokes, Which Is A Fundamental Prerequisite To Filing Suit

A party cannot maintain an infringement action "until preregistration or registration of the copyright claim has been made . . ." 17 U.S.C. § 411(a). Ninth

8

MEMORANDUM OF POINTS AND AUTHORITIES ISO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND/OR PARTIAL SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION

1303011                                                                 15-cv-01637-JLS-DHB

Glaser Weil

Circuit law is clear that a plaintiff cannot litigate an infringement claim until it has at least filed an application to register the allegedly infringed copyrights. *Cosmetic Ideas, Inc. v. IAC/Interactivecorp.*, 606 F.3d 612, 619-21 (9th Cir. 2010). It is the plaintiff's burden to demonstrate compliance with the Copyright Act's formalities, including proper registration. *See Olander Enters., Inc., v. Spencer Gifts, LLC*, 812 F. Supp. 2d 1070, 1075 (C.D. Cal. 2011).

Kaseberg cannot prove that he registered, or even attempted to register, the Tom Brady or UAB Jokes. In fact, Defendant Conaco, LLC requested "all documents relating to the application and/or registration of the JOKES AT ISSUE with the United States Copyright Office." UF 83. In response, Kaseberg agreed to produce all responsive, non-privileged documents in his possession without objection. UF 84. Kaseberg then produced uncertified copies of four registration certificates. UF 85. Those registrations covered: (1) "[t]ext of seven (7) jokes published on January 14, 2015," which corresponds to his Delta Joke's publication date, (2) "[s]ingle joke written and posted on Blog on June 9, 2015 re: Cul-De-Sac," which corresponds to his Bruce Jenner Joke, (3) "[t]ext of five (5) jokes posted on June 9, 2015 at 11:05 am," which also corresponds to his Bruce Jenner Joke, and (4) "[t]ext of single joke published on February 17, 2015," which corresponds to his Washington Monument Joke's publication date. *Id*.; UF 86.

Significantly, Kaseberg failed to produce any evidence proving that he registered the Tom Brady and UAB Jokes, which were first published on February 3, 2015 and December 3, 2014, respectively. The Copyright Office's records are consistent with Kaseberg's production. UF 87. Thus, Kaseberg's claims as to the Tom Brady and UAB Jokes must be dismissed for lack of standing.

### B.  Kaseberg Cannot Prove Copyright Infringement

To prove copyright infringement, a plaintiff must show that the defendant copied protected elements of an original work. *Funky Films, Inc. v. Time Warner Entm't Co., L.P.*, 462 F.3d 1072, 1076 (9th Cir. 2006). Copying can be established

9

through evidence of direct copying, or by showing that the defendant had "access" to the copyrighted material and that the works at issue are "substantially similar." *Id*. Kaseberg cannot prove that any copying occurred in this case.

### 1.    Kaseberg Lacks Any Evidence Of Direct Copying

*Conan's* monologue writers all emphatically deny copying Kaseberg's jokes. UF 88. ███████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████ UF 89. ████████████████████████████████████████████

██████████████████████████████████████████████████████ UF 90. As such, Kaseberg cannot prove direct copying.

### 2.    Kaseberg Cannot Establish Access

#### a.    The *Conan* Defendants Created The Delta And Washington Monument Jokes First

As a matter of law and logic, a defendant cannot have access to a plaintiff's copyrighted work where the defendant created the accused work first. *See Payne v. Anvil Knitwear, Inc.*, 2007 WL 1953438, at *2-3 (C.D. Cal. June 27, 2007) ("As a matter of law, Anvil did not have 'access' to Plaintiff's copyrights because Anvil Undated Designs were undisputedly created before Plaintiff's copyrights . . ."), *aff'd*, 293 F. App'x 475 (9th Cir. 2008).

Here, Kaseberg's Delta Joke was first posted on January 14, 2015 at 4:14 p.m. UF 91. But the *Conan* Defendants' Delta Joke was emailed to Weisberg on January 14, 2015 at 11:33 a.m.*, nearly five hours before Kaseberg published his joke*. UF 44.

Similarly, Kaseberg first published his Washington Monument Joke on February 17, 2015. UF 92. Yet, *Conan* aired a joke about the Washington Monument, which had the same concept and punchline as Kaseberg's joke, *over a year before Kaseberg's first publication date*. UF 50. Thus, Defendants lacked access to Kaseberg's Delta Joke and Washington Monument Joke as a matter of law.

### b.   Kaseberg Lacks Any Significant, Affirmative, And Probative Evidence To Establish Access

In cases lacking evidence of direct copying, such as this one, circumstantial evidence can be used to prove access by (1) establishing a chain of events linking the plaintiff's work and the defendant's access, or (2) showing that the plaintiff's work has been widely disseminated. *Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 482 (9th Cir. 2000). Access, however, "may not be inferred through mere speculation or conjecture." *Id*. Instead, it must be proven by showing that the defendant had a "reasonable opportunity" to view the plaintiff's work. *Id*. "[S]ignificant, affirmative, and probative evidence" is required to prove access. *Bernal v. Paradigm Talent and Literary Agency*, 788 F. Supp. 2d 1043, 1054 (C.D. Cal. 2010).

███████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

██████████████████████████████████████████████ UF 93. But that type of speculative assertion is woefully insufficient to establish the requisite chain of events. *See Meta-Film Assoc., Inc. v. MCA, Inc.*, 586 F. Supp. 1346, 1355 (C.D. Cal. 1984) (finding that "bare possibility" of access is insufficient to avoid summary judgment on a copyright infringement claim).

Moreover, courts have consistently held that a plaintiff cannot establish the requisite chain of events where the work is merely displayed on the Internet, and there is no direct evidence that a defendant actually visited the website. *See, e.g.*, *Bldg. Graphics, Inc. v. Lennar Corp.*, 708 F.3d 573, 580 (4th Cir. 2013) (finding that mere existence of a copyrighted work online is insufficient to support an inference that the work fell into the defendant's hands); *Chafir v. Carey*, 2007 WL 2702211, at *3 (S.D.N.Y. Sept. 17, 2007) ("[T]he fact that Plaintiff's Song was available on a publicly accessibly [sic] website does not prove access, because there is no evidence that Defendants actually visited the website on which Plaintiff's Song was posted.").

Here, *three* different monologue writers initially created the *Conan* Defendants'

11

Glaser Weil

accused jokes. Yet, all three testified that they have never visited Kaseberg's blog or Twitter page. UF 94. ███████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███ UF 90. Kaseberg also failed to produce any evidence (*e.g.*, records reflecting "hits" to his website, list of accounts that follow his Twitter page, metatags used to attract viewers to his websites, etc.) that could link the *Conan* Defendants to Kaseberg's jokes. Accordingly, Kaseberg's general online presence is insufficient to establish a chain of events linking Kaseberg and Defendants.

Kaseberg also cannot establish that his jokes were widely disseminated. In fact, Kaseberg's only "evidence" of widespread dissemination is that "[a]nyone, including defendants and employees of defendants may access his content using a web browser." UF 95. But merely having an online presence is insufficient to establish widespread dissemination. *See, e.g.*, *Art Attacks Ink, LLC v. MGA Entm't, Inc.*, 581 F.3d 1138, 1144 (9th Cir. 2009) (recognizing that while the Internet can reach a wide audience, there must be evidence to demonstrate wide dissemination); *Stabile v. Paul Smith Ltd.*, 137 F. Supp. 3d 1173, 1187 (C.D. Cal. 2015) (finding that "simply displaying an image on [plaintiff's] website for an undeterminable period of time is insufficient to demonstrate that it was widely disseminated").

Further, "the public dissemination necessary to infer that a defendant might have had access to the work is considerable." *Loomis v. Cornish*, 2013 WL 6044345, at *10 (C.D. Cal. Nov. 13, 2013). Again, Kaseberg failed to produce *any* evidence (*e.g.*, records reflecting hits to his website) to establish that his blog or Twitter are widely disseminated. In fact, to the extent any information concerning Kaseberg's online reach can be gleaned from Kaseberg's evidence, such information cuts against a finding of widespread dissemination. For example, the three asserted jokes he posted to Twitter all show very little engagement, if any. Specifically, the Tom Brady Joke received no more than two likes and zero retweets, and the Washington

Glaser Weil

Monument Joke and the Bruce Jenner Joke received no likes or retweets, at the time of the alleged infringement. UF 96. Such marginal reach dispels any realistic notion that dissemination of Kaseberg's jokes was considerable.

Summary judgment should be entered in Defendants' favor based on the issue of access alone.

### 3.    Kaseberg's Copyright Is "Thin" And He Cannot Establish The Jokes At Issue Are Virtually Identical

To determine substantial similarity, the Ninth Circuit applies a two-part test consisting of extrinsic and intrinsic components. *Rice v. Fox Broad. Co.*, 330 F.3d 1170, 1174-75 (9th Cir. 2003). For summary judgment, only the extrinsic test is relevant. *Id.* at 1174. The extrinsic test involves an objective comparison of the articulable similarities between two works. *Id.* It is the plaintiff's burden to identify the protectable elements of the copyrighted work that allegedly are copied. *Apple Computer, Inc. v. Microsoft Corp.*, 35 F.3d 1435, 1443 (9th Cir. 1994). Only protected expression is relevant for purposes of assessing substantial similarity. *Shaw v. Lindheim*, 919 F.2d 1353, 1361 (9th Cir. 1990). Thus, "'[s]ubstantial similarity' refers to similarity of expression, not merely similarity of ideas or concepts." *Dr. Seuss Enter., L.P. v. Penguin Books USA, Inc.*, 109 F.3d 1394, 1398 (9th Cir. 1997).

Further, in applying the extrinsic test, courts must use "analytic dissection to determine the scope of copyright protection before works are considered 'as a whole.'" *Id.* Thus, "when applying the extrinsic test, a court must filter out and disregard the non-protectable elements in making its substantial similarity determination." *Cavalier v. Random House, Inc.*, 297 F.3d 815, 822 (9th Cir. 2002).

"[T]he court must then apply the relevant limiting doctrines in the context of the particular medium involved, through the eyes of the ordinary consumer of that product." *Apple Computer*, 35 F.3d at 1443. Finally, "[h]aving dissected the alleged similarities and considered the range of possible expression, the court must define the scope of the plaintiff's copyright – that is, decide whether the work is entitled to

13

MEMORANDUM OF POINTS AND AUTHORITIES ISO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND/OR PARTIAL SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION

1303011                                                                                                        15-cv-01637-JLS-DHB

'broad' or 'thin' protection." *Id*. The scope of protection sets the appropriate standard for a subjective comparison of the works as a whole to determine whether they are sufficiently similar. *Id*. "Where a copyrighted work is composed largely of unprotectable elements . . . it receives thin rather than a broad scope of protection." *Idema v. Dreamworks, Inc*., 162 F. Supp. 2d 1129, 1178 (C.D. Cal. 2001) (internal citations and quotations omitted). A "thin" copyright only protects against virtually identical copying. *Ets-Hokin v. Skyy Spirits, Inc.*, 323 F.3d 763, 766 (9th Cir. 2003).

### a.  **Kaseberg's Jokes Only Warrant "Thin" Protection**

Kaseberg's monologue-style jokes are undeniably composed largely of unprotectable elements, and thus, are only entitled to thin copyright protection.

Kaseberg's setups are derived entirely from current events and news stories, and it is axiomatic that current events and news stories are not copyrightable. *Feist Publ'n, Inc. v. Rural Tel. Serv. Co., Inc.*, 499 U.S. 340, 348 (1991). ███████

████████████████████████████████████████

███████ UF 97. Kaseberg's punchlines, as with jokes in general, convey *ideas*. Yet, ideas are not copyrightable. *Shaw*, 919 F.2d at 1356 ("ideas within a work are not protected"). Indeed, as stated in the leading treatise on copyright law, jokes are unlikely to contain significant original (*i.e.*, protectable) expression as compared to other copyrightable works "given how many arise out of 'stock situations.'" Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 2.13 (Mathew Bender rev. ed. 2016). Nimmer further states that "as the value of a joke often inheres in its idea rather than its particular expression, this limitation may act more severely here than in other copyright domains." *Id*. Nimmer's statements regarding the copyrightability of jokes rings especially true here. Unlike many other types of jokes, Kaseberg's jokes rely exclusively on ideas, not expression, to derive the desired humor. Thus, Kaseberg's punchlines are inherently composed of unprotectable elements.

Moreover, the possibilities of expressing a particular (unprotectable) idea which flows from the same (unprotectable) factual premise in a short, single sentence

14

Glaser Weil

punchline is necessarily limited. This too warrants application of the "virtual identity" standard of analysis. *Mattel, Inc. v. MGA Entm't, Inc.*, 616 F.3d 904, 914 (9th Cir. Cal. 2010) ("If there's only a narrow range of expression … then copyright protection is 'thin' and a work must be 'virtually identical to infringe.'").

Even assuming that some expressive elements remain after filtering out the underlying ideas from Kaseberg's punchlines, those expressive elements still barely qualify for copyright protection, if at all. Significantly, Kaseberg wrote his punchlines using commonly-used expressions, and "[o]rdinary phrases are not entitled to copyright protection." *Narell v. Freeman*, 872 F.2d 907, 911 (9th Cir. 1989). For example, the punchline for Kaseberg's Delta Joke is "[a]nd they wrestled for control of the armrest the entire flight." That expression conveys the underlying, unoriginal idea – that two people fought for control of an armrest – in a completely unoriginal and stereotypical fashion. And that ordinary phrase, when focusing on the expression (as opposed to the underlying idea), is, at best, only entitled to minimal copyright protection. Otherwise, Kaseberg would effectively have a monopoly as to the joke (*i.e.*, the idea) itself, which would be improper. *See Foxworthy v. Custom Tees, Inc.*, 879 F. Supp. 1200, 1219 (N.D. Ga. 1995) ("two entertainers can tell the same joke, but neither entertainer can use the other's combination of words"). The same conclusion can be reached as to Kaseberg's other punchlines, which similarly employ unoriginal, commonly-used expressions, as demonstrated below. As such, the punchlines are, at best, only entitled to minimal copyright protection.

Accordingly, to the extent that Kaseberg's jokes are entitled to any copyright protection, such protection is "thin."

### b. Stripped of Non-Protectable Elements, The Expression In The Parties' Jokes Are Not Virtually Identical

Defendants concede that at first blush, the jokes appear similar. But in an infringement context, the analysis compares only the protectable aspects of an allegedly infringed work. *Apple Computer*, 35 F.3d at 1435 ("Only those elements of

15

a work that are protectable ... can be compared); *see also Funky Films,* 462 F.3d at 1077 (courts only look to whether "protectable elements, standing alone, are substantially similar") (internal citations omitted). When unprotectable elements are excluded, as they must be, Kaseberg cannot establish that his jokes are virtually identical. Indeed, a careful comparison of the jokes demonstrates that any similarities are limited to unprotectable ideas and unoriginal comedic conventions, which cannot give rise to infringement. *Data East USA, Inc. v. Epyx, Inc.*, 862 F.2d 204, 208 (9th Cir. 1988) ("[T]o the extent the similarities between plaintiff's and defendant's works are confined to ideas and general concepts, these similarities are noninfringing."). In contrast, substantial differences exist as to the *particular expression* of the jokes.

Among other distinguishing factors in the expression, the parties' jokes are worded differently, convey different actions, contain different levels of information, and involve different perspectives. Moreover, the structure of the jokes are different in large part because the jokes were intended to be delivered to their respective audiences in different mediums. In particular, Kaseberg wrote and published his jokes to be read online. As such, Kaseberg's jokes follow the same, two-sentence, setup-punchline format, which is concisely digestible to a passive, solitary audience. In contrast, the *Conan* Defendants' jokes are performed on stage by O'Brien, delivered to an audience. The *Conan* monologue writers craft the jokes with that distinction in mind. Thus, the structure and delivery of the jokes are more conversational in nature and often include improvised or ad-libbed language based on the audience's reaction. The *Conan* Defendants' jokes are structured such that the jokes will get the biggest laugh from the studio audience in the moment. Further, millions of people have a familiarity with O'Brien, and the writers take care to craft jokes that are consistent with his voice and his brand. Specific examples of these various distinguishing factors as to the protectable expression in the jokes at issue are presented below.

**The Delta Joke**: O'Brien sets up the *Conan* Defendants' Delta Joke with the following language before the premise: "This never happens anymore. This is a

Glaser Weil

strange story." Conversely, Kaseberg's Delta Joke immediately jumps into the premise (which he copied from the *Conan* Defendants). Kaseberg's Delta Joke further states that the passengers "wrestled for control" of the armrest "the entire flight." In contrast, the *Conan* Defendants' joke says that passengers spent the "whole flight fighting over the armrest." Thus, the parties' jokes used different expressive language ("wrestle" vs. "fight" and "entire" vs. "whole"), where the *Conan* Defendants' punchline is structured in an inverse manner as compared to Kaseberg's punchline.

Also, the fact that the *Conan* Defendants' joke ended with the word "armrest" is significant. They deliberately ended the joke with the word "armrest" to prevent running over the humor in the punchline with additional words. UF 98. ███████████ ████████████████████████████████████████████████████████████████████ ██████████████████████ UF 99. ████████████████████████████████████████ ████████████████████████ UF 100. Of course, one joke cannot be better than another if the jokes are virtually identical. The parties' jokes are also distinguishable because O'Brien followed the joke's premise with "Two passengers on the whole plane" before seguing to his punchline, whereas Kaseberg's joke contains no such transition.

**The Tom Brady Joke**: the *Conan* Defendants' Tom Brady Joke makes two references to "Super Bowl" in the setup alone. Kaseberg's Tom Brady Joke fails to use the term "Super Bowl" at all. Instead, it makes a single reference to the "game." the *Conan* Defendants' setup also makes clear that Tom Brady was given the truck for earning the honor of Super Bowl MVP. Kaseberg's joke mentions the "MVP truck" with no reference to the Super Bowl, or how the truck was Brady's to give away.

O'Brien elaborates on the joke's setup by twice mentioning how nice it is for Tom Brady to give the truck away. Kaseberg's joke contains no similar reference or segue. O'Brien responds to the audience's reaction midstream (saying "I do" and "yes") before delivering the punchline. Kaseberg's joke has no such language.

Moreover, Kaseberg's punchline reads "enjoy the truck Pete Carroll." In contrast, the *Conan* Defendants' punchline reads "So, Brady is giving his truck to

17

MEMORANDUM OF POINTS AND AUTHORITIES ISO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND/OR PARTIAL SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION

1303011                                                                                                    15-cv-01637-JLS-DHB

Seahawks coach Peter Carroll." the *Conan* Defendants' Tom Brady Joke specifically identifies Pete Carroll as the Seahawks coach. Kaseberg's does not. Kaseberg's Tom Brady Joke also sarcastically tells Pete Carroll to "enjoy" the truck, whereas the *Conan* Defendants' joke is expressed in a more neutral tone. Finally, in Kaseberg's Tom Brady Joke, the audience must infer that the truck was given to Pete Carroll. The *Conan* Defendants' joke explicitly says Tom Brady gave the truck to Pete Carroll.

**The Washington Monument Joke**: Kaseberg's setup reads: "The Washington Monument is ten inches shorter than previously thought." Notably, this exact phrasing was used in a tweet by Jimmy Fallon *the day before Kaseberg's publication*. UF 115. Conversely, the *Conan* Defendants' premise reads: "Yesterday, surveyors announced that the Washington Monument is ten inches shorter than what's been recorded." This phrasing offers more specific information – *e.g.*, when and how it was discovered the monument was shorter, and who made the discovery. Kaseberg's setup does not offer any of these details. The setups are further distinguishable, as the *Conan* Defendants' joke makes clear the monument is shorter than what had been "previously *recorded*," while Kaseberg uses the language "previously *thought*." In the middle of the *Conan* Defendants' joke, O'Brien again inserts a "yeah." Kaseberg's joke does not.

The *Conan* Defendants' punchline anthropomorphizes the Washington Monument, suggesting that the monument itself blamed the "shrinkage" on the cold weather. In contrast, Kaseberg's joke presents the punchline from an outside perspective, stating that, "You know the winter has been cold when a monument suffers from shrinkage." Beyond the objective differences in the wording of the punchlines, the punchlines are suggesting different things. In saying that the monument blamed the colder weather for the "shrinkage," the *Conan* Defendants' joke suggests that the other factors could be to blame. In contrast, Kaseberg's joke explicitly provides that the shrinkage is indeed the result of cold weather. Kaseberg's joke mentions the winter has been cold, where the *Conan* Defendants' references the cold weather – untethered to any season. Finally, O'Brien concludes his joke noting it

Glaser Weil

was a "penis joke." Kaseberg ends his joke with the shrinkage punchline.

**The Bruce Jenner Joke**: Kaseberg's premise specifically identifies *three* towns which have streets named after Bruce Jenner. In contrast, the *Conan* Defendants' setup only mentions that "some cities have streets named after Bruce Jenner." Kaseberg's joke says the towns "*have to consider changing* the name to Caitlyn." The *Conan* Defendants' joke says that cities are actively "*trying to change* the streets' name to Caitlyn *Jenner*" – including "Jenner" where Kaseberg did not.

Further, Kaseberg's punchline states that one street will "have to change from a Cul-De-Sac to a *Cul-de-Sacless*." The *Conan* Defendants' joke says that "*Bruce Jenner* Cul-De-Sac . . . will be now *cul-de-no-sac*" – ending the joke on the hard "k" sound. Moreover, the *Conan* Defendants' joke is directed to residents of the street, specifically introducing the punchline with the phrase "If you live on Bruce Jenner Cul-De-Sac…" Kaseberg's joke has no such preamble to his punchline.

**The UAB Joke**: O'Brien introduces the joke by stating "Big news in sports." Kaseberg's joke contains no lead-in. Once O'Brien transitions into the factual setup of his joke, he focuses on the fact that the "University of Alabama-Birmingham *has decided to discontinue* its football *team*." Kaseberg begins his joke by stating, "The University of Alabama-Birmingham *is shutting down* its football *program*." O'Brien presents the joke in the passive voice, using the term "discontinue," while Kaseberg presents the setup in the active voice, and uses the phrase "shutting down." In between the setup and punchline, O'Brien again acknowledges the audience ("yeah"). Kaseberg's joke has no such transition from the setup to the punchline.

Regarding the punchlines, the expressions are vastly different. Kaseberg's punchline reads, "To which the Oakland Raiders said; 'Wait, so you can do that?'" Alternatively, O'Brien states: "When they heard the news, New York Jets' fans said, wait, can you do that?" The differences here are significant. First, the jokes implicate two different football teams – the Oakland Raiders and the New York Jets. Second, the *Conan* Defendants' Joke quotes Jets *fans*, while Kaseberg's quote is offered by the

19

MEMORANDUM OF POINTS AND AUTHORITIES ISO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND/OR PARTIAL SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION

1303011

15-cv-01637-JLS-DHB

Glaser Weil

1   Raiders' football *team* itself. Further, in Kaseberg's joke, the Raiders organization

2   asks "*you can* do that?," while the *Conan* Defendants' joke is worded so that Jets'

3   fans ask "*can you* do that?" ████████████████████████████████████████████

4   ████████████████████████████ UF 101. ████████████████████████████████

5   ██████████████████████████████████████████████ UF 102. This leaves no

6   similar, protectable elements in the punchline to distinguish. Finally, O'Brien expands

7   on the punchline ("Is that something you can do?") whereas Kaseberg does not.

8       Overall, no reasonable juror could conclude that any protected expression in the

9   parties' jokes is virtually identical. As such, summary judgment of noninfringement

10  should be granted in Defendants' favor.

11      **C.    The *Conan* Defendants' Independently Created The Jokes At Issue**

12      Defendants are also entitled to summary judgment if their jokes were

13  independently created. *See Granite Music Corp. v. United Artist Corp.*, 532 F.2d 718,

14  720 (9th Cir. 1976) (holding that proof of independent creation rebuts a claim of

15  copyright infringement). The evidence presented in this case firmly establishes that

16  the *Conan* Defendants' jokes were independently created.

17      *First*, as explained above, the *Conan* Defendants created the Delta and

18  Washington Monument Jokes before Kaseberg's initial publication. *See supra* at

19  IV(B)(2)(a). That fact alone is sufficient to establish that Defendants independently

20  created these two jokes. *Christian v. Mattel, Inc.*, 286 F.3d 1118, 1128 (9th Cir. 2002)

21  ("By simple logic, it is impossible to *copy* something that does not exist.").

22      *Second*, evidence relating to the creation the its accused jokes also conclusively

23  establishes they were independently created by the *Conan* Defendants. For example,

24  the three monologue writers that created the accused jokes all declared, under penalty

25  of perjury, that they did not copy Kaseberg's jokes. UF 88. None of them had ever

26  heard of Kaseberg, visited Kaseberg's blog or twitter page, or seen any of Kaseberg's

27  jokes at issue prior to the alleged infringement. UF 94. And despite taking eleven

28  depositions, none of Defendants' witnesses testified to having even heard of

Glaser Weil

Kaseberg, much less viewing his blog, twitter page, or the jokes at issue, prior to learning about Kaseberg's accusations. UF 103. Moreover, all communications between Comers, Kiley, Kutner, and Weisberg for the days at issue were produced. UF 104. None of those communications mention Kaseberg or his material. *Id.*

Additionally, the three monologue writers that created the *Conan* Defendants' jokes do not perform general online searches, look at other comics' materials, or visit social media to perform their premise research. UF 105. Their limited research is restricted to a handful of specific news outlets they prefer, and is solely to gather factual premises – not to gain inspiration for punchlines. UF 106. This makes it virtually impossible for any writer, much less three separate writers, to have independently stumbled onto Kaseberg's jokes for source material – especially given the limited reach of his posts and the non-existent awareness of his platforms.

Even assuming that *Conan*'s writers all independently reviewed Kaseberg's jokes online, they still would have absolutely no incentive to copy those jokes given *Conan*'s submission protocol. There is no requirement that a writer submit a minimum number of jokes for the monologue each day. UF 107. Nor is there any requirement that a show's monologue must feature a certain number of jokes. UF 108. Monologue jokes are reviewed anonymously. UF 37. There is no attribution as to individual monologue jokes, and the show does not keep track of a particular monologue writer's submissions. UF 38. Because of this process, the monologue submissions of any writer do not, and could not, factor in to their standing at the show – including decisions regarding retention, termination, or compensation. *Id.*

In contrast, *Conan's* monologue writers have good reason to deliberately avoid copying material. O'Brien, Sweeney, Comers, Kutner and Kiley all testified that stealing jokes is an unacceptable practice. UF 109. Consistent with this view, *Conan* has an informal policy in place where monologue jokes will be pulled if it is ever discovered that they are similar to a joke told by anyone else, even if the similarity is purely coincidental. UF 110. As such, it simply does not follow that O'Brien, or his

21

MEMORANDUM OF POINTS AND AUTHORITIES ISO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND/OR PARTIAL SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION

1303011                                                                                          15-cv-01637-JLS-DHB

writers, would risk their reputations, and potentially their careers, to search out and copy Kaseberg's jokes for use on the show.

The time-intensive, highly structured process of developing *Conan*'s monologue further supports a determination that the *Conan* Defendants independently created the accused jokes. On a typical day, the writers spend a maximum of 90 minutes researching premises, but submit at least 30 jokes. UF 111. Between the meetings they attend, and the time it takes to write the approximately 30-plus jokes each writer submits, the writers simply do not have the time to check on comedy writers' online platforms, or scour the internet for monologue-style jokes to steal.

In addition to time constraints, the *Conan* Defendants' jokes are informed by other characteristics of the monologue development process. For example, the Washington Monument joke spawned from an intern premise circulated the afternoon the joke aired. UF 112. Notably, the intern pulled the premise from a Huffington Post Article, not from Kaseberg. *Id*. Moreover, the UAB's joke's punchline, "Wait, can you do that?" is a catch phrase used by O'Brien in his punchlines countless times over the years. UF 57. Indeed, *Conan's* monologue writers submitted some variation of the punchline numerous times with various factual setups. UF 58. This is further indicia of the *Conan* Defendants' independent creation.

*Third*, any similarities between the parties' jokes are attributable to the nature of the jokes themselves. Because premises to monologue-style jokes derive from current events and news stories, countless people (*e.g*., other late-night hosts, individuals on social media, etc.) are all creating jokes derived from the same starting point. As such, it is inevitable that multiple parties will, at times, also arrive at the same end point to a joke, independent of one another. ███████████████

████████████████████████████████████████████████████████

███████████████████████████████████ UF 113.

The jokes at issue in this case are particularly susceptible to overlap due to parallel thought. Indeed, at least six different people posted jokes similar to the Tom

Glaser Weil

Brady Joke, UF 114; 17 different people posted jokes similar to the Washington Monument Joke, UF 115; four different people posted jokes similar to the Bruce Jenner Joke, UF 116; and two different people posted jokes similar to the UAB Joke, UF 117 – all *before* Kaseberg's publications. And the similarities were not trivial.

For example, in response to a tweet reporting that Tom Brady wants to give his truck to Patriots teammate Malcom Butler, a Twitter user joked, "Why not Pete Carroll?" UF 118. Another Twitter user wrote, "The Washington Monument has been found to be 10 feet shorter than originally measured. I blame the cold weather for the shrinkage." UF 119. Another person tweeted an article about whether Bruce Jenner Lane in Austin should change its name and joked, "Not if it's a cul-de-sac." UF 120. Finally, one Twitter user posted: "So UAB is shutting their football program down. Can the Titans do that?!?" UF 121. These examples demonstrate the prevalence of parallel thought as to the jokes at issue here.

███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
████████████████████████████████ UF 122. Boosler acknowledged that the topics at issue here lend themselves to parallel thought, as they were derived from noteworthy current events. UF 123. She also noted that Kaseberg's punchlines were not particularly unique. UF 124. Given this, she testified that overlap among the jokes at issue could be attributable to parallel thought. UF 125.

Beyond the jokes at issue in this action, the *Conan* Defendants produced twelve additional examples of parallel thought occurring between *Conan* and Kaseberg. UF 126. In each of these instances *Conan*'s joke was created first. *Id.* Assuming Kaseberg did not copy these jokes, these examples further demonstrate that similarities among jokes by Kaseberg and the *Conan* Defendants are a result of parallel thought, as opposed to deliberate copying. Notably, when confronted with these examples at deposition, Boosler was unable to provide any alternative explanation for the overlap beyond the existence of parallel thought, or independent creation. UF 125.

In addition to the parties' jokes' styles, overlap between their jokes can also be attributed to Kaseberg's repeated, deliberate efforts to imitate the monologue jokes featured in late-night shows, including *Conan*. ███████████████████████ ███████████████████████████████████ UF 41. ████████████ ██████████████████████████████████████ ███████████████████ UF 9, UF 73. ███████ ████████████████████████████████████████ ████████████████████████████ UF 72. Given all this, it is unsurprising that sporadic instances of overlap occurred between the parties. Indeed, the only surprise is that, given these circumstances, Kaseberg would accuse the *Conan* Defendants of stealing his jokes, which has been refuted by all evidence in this case.

Finally, taking a broader look at this issue, it is evident that parallel thought is an innate reality in the world of late-night talk shows and monologue jokes. Indeed, *Conan's* writers testified (and declared under penalty of perjury) to this being a frequent occurrence among their own staff, and to having personal experience with it happening among other shows. UF 127. Indeed, a fairly recent example of this can be seen in the monologues of *Late Night with Seth Meyers* and *The Late Show with James Corden*. During her presidential campaign, Hillary Clinton referred to Donald Trump supporters as a "basket of deplorables." Latching onto this current event, both Myers and Corden joked during their monologues that "basket of deplorables" sounds like a product offered by KFC. UF 128. On top of that, several people on Twitter made the same observation, on the same premise, before either show aired. UF 129. This serves to show that newsworthy events – like those that serve as the premises for the jokes at issue – inherently result in parallel thought, both across late night shows, and between late-night shows and social media users.

In sum, substantial and compelling evidence exists to justify summary judgment based on independent creation in this case.

### D.    Defendants Did Not Willfully Infringe Kaseberg's Copyrights

The Copyright Act provides an additional remedy if the plaintiff can show that the violation was willful. *See* 17 U.S.C. § 504(c)(2). To prove willfulness, "the plaintiff must show (1) that the defendant was actually aware of the infringing activity, or (2) that the defendant's actions were the result of 'reckless disregard' for, or 'willful blindness' to, the copyright holder's rights." *Washington Shoe Co. v. A-Z Sporting Goods Inc.*, 704 F.3d 668, 674 (9th Cir. 2012). "[W]here the relevant facts are admitted or otherwise undisputed, willfulness can be appropriately resolved on summary judgment." *UMG Recordings, Inc. v. Disco Azteca Distrib., Inc.*, 446 F. Supp. 2d 1164, 1174 (E.D. Cal. 2006) (citation omitted).

Here, Kaseberg has zero evidence to show that O'Brien or his writers were aware of the asserted jokes prior to O'Brien's relevant performances. Nor does Kaseberg have any evidence to show that O'Brien recklessly disregarded Kaseberg's rights when telling his monologue jokes. In fact, as explained above, Kaseberg cannot even establish that O'Brien or his writers had any access to Kaseberg's jokes in order to willfully infringe any copyrights. Accordingly, based on all of the facts set forth above, Defendants respectfully request that this Court grant summary adjudication as to the issue of willfulness in Defendants' favor.

### V.    CONCLUSION

For the aforementioned reasons, Defendants respectfully request that this Court grant their motion for summary judgment. However, if for any reason complete summary judgment cannot be granted, Defendants request that that this Court grant partial summary judgment, or in the alternative, grant summary adjudication of the issues that it deems appropriate.

MEMORANDUM OF POINTS AND AUTHORITIES ISO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND/OR PARTIAL SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION

1303011                                                                                          15-cv-01637-JLS-DHB

1    DATED:  February 3, 2017      GLASER WEIL FINK
         HOWARD AVCHEN & SHAPIRO LLP

2

3                                    By: */s/ Erica J. Van Loon*

4                                      PATRICIA L. GLASER
                                     ERICA J. VAN LOON

5                                      REX HWANG
                                     NICHOLAS E. HUSKINS

6                                      *Attorneys for Defendants Conaco LLC;*
                                     *Turner Broadcasting System;*

7                                      *Time Warner, Inc.; Conan O'Brien;*
                                     *Jeff Ross; Mike Sweeney*

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MEMORANDUM OF POINTS AND AUTHORITIES ISO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND/OR
PARTIAL SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION

1303011                                                                15-cv-01637-JLS-DHB

*Glaser Weil*