UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROBERT ALEXANDER KASEBERG,<br><br>Plaintiff,<br><br>v.<br><br>CONACO, LLC; TURNER BROADCASTING SYSTEM; TIME WARNER, INC.; CONAN O'BRIEN; JEFF ROSS; MIKE SWEENEY; DOES 1–10, inclusive,<br><br>Defendants. | Case No.: 15cv1637 JLS (DHB)<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>(ECF No. 70) |

Presently before the Court is Defendants' Motion for Summary Judgment and/or Partial Summary Judgment or, in the Alternative, Summary Adjudication ("MSJ"), (ECF No. 70; *see also* ECF Nos. 88–91); Plaintiff's Response in Opposition re Motion for Summary Judgment ("Opp'n"), (ECF No. 97; *see also* ECF No. 101); and Defendants' Reply in Support of Motion for Summary Judgment ("Reply"), (ECF No. 106; *see also* ECF Nos. 109–11). The Court held a hearing regarding the pending Motion ("Hr'g Tr."), (ECF No. 123), and ordered supplemental briefing on an issue that was for the first time raised in Defendants' Opposition and Plaintiff's Reply. Those supplemental briefs are now also before the Court. (ECF Nos. 124, 127.)

1

After considering the Parties' arguments and the law, the Court takes the matter under submission and **GRANTS** Defendants' Motion for Summary Judgment as to the (1) Delta Joke and (2) UAB Joke, and **GRANTS** Defendants' Motion for Summary Adjudication regarding the determination that Plaintiff's jokes are entitled to "thin" copyright protection. The Court otherwise **DENIES** Defendants' Motion for Summary Judgment.

## BACKGROUND

Plaintiff Robert Alexander Kaseberg has been a freelance writer and comedy writer for over twenty years. (Kaseberg Decl. ¶ 2, ECF No. 97-3.) Although Plaintiff has never been staffed or credited as a writer on any television show, he has written articles and jokes that have appeared in publications such as *The Chicago Tribune*, *The New York Times*, *The Washington Post*, *The Los Angeles Times*, *Time* magazine, and *Sports Illustrated*, among others. (*Id.* ¶ 3.) Additionally, Plaintiff has worked with an independent production company for the last twenty years through which he has had over one-thousand jokes used by Jay Leno. (*Id.* ¶ 4.)

Plaintiff greatly enjoys late-night television talk shows and posts many "monologue" style jokes to his blog and twitter account. (*Id.* ¶¶ 5–6.) However, the laughter stopped in late 2014 and early 2015, at least for a spell, when Plaintiff began to notice similarities between his posts and several of the jokes used in the late-night television show *Conan*'s monologues. (*See id.* ¶ 7.) After Plaintiff several times unsuccessfully reached out to *Conan* staff members he filed the instant suit for copyright infringement.

Defendants all share some connection to the *Conan* show. Conan O'Brien created and hosts *Conan*, (O'Brien Decl. ¶ 1, ECF No. 70-11), with the support of a staff of writers including Mike Sweeney, who served as *Conan*'s head writer during all times relevant to this lawsuit, (Sweeney Decl. ¶¶ 1–2, ECF No. 70-5). Additionally, relevant to this Motion for Summary Judgment but not named as Defendants, Rob Kutner, Josh Comers, Brian Kiley, and Andres de Bouchet were writers and Danielle Weisberg was a

/ / /

writers' assistant for *Conan* during periods at issue in this action. (ECF Nos. 70-4, 70-8, 70-9, 70-16; *see* ECF No. 101-4 at 8–9.)

Plaintiff brought suit for Defendants' alleged infringement of five jokes, spanning the time period from December 2, 2014 to June 9, 2015. (First Am. Compl. ¶¶ 14–27, ECF No. 58.) These jokes, in order of date of alleged infringement, are (1) the "UAB Joke;" (2) the "Delta Joke;" (3) the "Tom Brady Joke;" (4) the "Washington Monument Joke;" and (5) the "Jenner Joke." Plaintiff reached out to several *Conan* writers during this same time period.

**The UAB Joke:** On December 2, 2014, Kaseberg posted on his blog that "The University of Alabama-Birmingham is shutting down its football program. To which the Oakland Raiders said; 'Wait, so you can do that?' " (Van Loon Decl. Ex. 10, ECF No. 70-3 at 40.)  The following day, O'Brien stated on *Conan* that there was "Big news in sports. University of Alabama-Birmingham has decided to discontinue its football team. Yeah. When they heard the news, New York Jets fans said, 'Wait can you do that? It's something you can do?' " (*Id.* Ex. 12, ECF No. 70-3 at 50.)

**The Delta Joke:** On January 14, 2015, at approximately 11:33 a.m., (Comers Decl. Ex. 2, ECF No. 70-8 at 24), writer Comers submitted a monologue joke for that evening's *Conan* episode that stated "Yesterday, a Delta flight from Cleveland to New York took off with just 2 passengers. Yet somehow, they spent the whole flight fighting over the armrest." (Van Loon Decl. Ex. 6, ECF No. 70-3 at 26.) Later that afternoon, at 4:14 p.m., Plaintiff posted on his blog that "A Delta flight this week took off from Cleveland to New York with just two passengers. And they fought over control of the armrest the entire flight." (*Id.* Ex. 3, ECF No. 70-3 at 14.) Sometime over the next several hours, O'Brien performed a version of the joke in his *Conan* monologue. (*See id.* Ex. 6, ECF No. 70-3 at 26.)

Two days after the Delta Joke aired, Plaintiff tweeted Defendant Sweeney saying Plaintiff was "95% sure [he] had a joke from [his] blog used on the show. I'm not upset, [but] would like the opportunity to contribute jokes." (Sweeney Decl. Ex. 2, ECF No. 70-

/ / /

5 at 14.) Sweeney received the tweet, but elected not to respond. (Lorenzo Decl. Ex. 3, at 55:1–14, 56:10–15, ECF No. 101-4 at 6–7.)

**The Tom Brady Joke:** On February 3, 2015, Plaintiff posted on Twitter at 8:49 a.m. and on his blog at 9:02 a.m. that "Tom Brady said he wants to give his MVP truck to the man who won the game for the Patriots. So enjoy that truck, Pete Carroll." (Van Loon Decl. Ex. 13, ECF No. 70-3 at 55.) Later that day, at approximately 3:14 p.m., (MSJ 6), writer Kiley submitted a joke for the following night's *Conan* monologue, which O'Brien later performed, stating "Tom Brady said he wants to give the truck that he was given as Super Bowl MVP . . . to the guy who won the Super Bowl for the Patriots. Which is very nice. I think that's nice. I do. Yes. So Brady's giving his truck to Seahawks coach Pete Carroll." (Van Loon Decl. Ex. 14, ECF No. 70-3 at 57.)

Two days after the Tom Brady Joke aired, Plaintiff tweeted writer de Bouchet saying "Brady joke was on my blog on Feb. 3 and on the monologue on Feb. 4. Any chance I can send jokes on my own as a freelancer?" (Van Loon Decl. Ex. 20, ECF No. 70-3 at 85.) De Bouchet brought this tweet to Defendant Sweeney's attention, but did not respond to Plaintiff. (Lorenzo Decl. Ex. 3, at 57:4–25, ECF No. 101-4 at 8.) Sometime after de Bouchet's and Sweeney's conversation, Sweeney spoke to other writers on the show about Plaintiff. (*Id.* at 58:8–24, 60:17–25, ECF No. 101-4 at 9, 11.) And sometime between the airing of the Tom Brady and Washington Monument jokes, Plaintiff called Defendant Sweeney and left a message, although Plaintiff received no response. (Van Loon Decl. Ex. 19, ECF No. 70-3 at 80–81.)

**The Washington Monument Joke:** On February 17, 2015, Plaintiff posted on Twitter at 7:21 a.m. and on his blog at 11:20 a.m. that "The Washington Monument is ten inches shorter than previously thought. You know the winter has been cold when a monument suffers from shrinkage." (Van Loon Decl. Ex. 7, ECF No. 70-3 at 30.) Later that day, at approximately 1:23 p.m., (MSJ 5), writer Kiley submitted a joke for that night's *Conan* monologue, which O'Brien later performed, stating "Yesterday surveyors[] announced that the Washington Monument is ten inches shorter than what's been

4

previously recorded. Yeah. Of course, the monument is blaming the shrinkage on the cold weather. Penis joke." (*Id.* Ex. 9, ECF No. 70-3 at 35.)

The day after the Washington Monument Joke aired, Plaintiff again called Defendant Sweeney. (Van Loon Decl. Ex. 19, ECF No. 70-3 at 81–82.) And although Plaintiff was finally able to reach him, Plaintiff characterized the resulting conversation as an "agonizing" one, where Sweeney "angrily and loudly" denied any suggestion that "his writers would have anything to do with [Plaintiff's] pathetic blog and it's [sic] author, [Plaintiff], a no-name failure." (*Id.*) After the call, Plaintiff tweeted Sweeney saying "Thanks for taking my call. Last thing I wanted was to sound accusing. If there is any way I can contribute jokes, let me know." (Sweeney Decl. Ex. 2, ECF No. 70-5 at 14.)

Several weeks later, on March 11, 2015, Plaintiff's attorney sent a letter to Defendant Conaco, LLC regarding the jokes. (Kaseberg Decl. ¶ 21, ECF No. 97-3 at 5.) Correspondence continued for the next several months with no resolution. (*Id.*)

**The Jenner Joke:** On June 9, 2015, Plaintiff posted on his blog at 11:05 a.m. and on Twitter at 11:31 a.m. that "Three towns, two in Texas, one in Tennessee, have streets named after Bruce Jenner and now they have to consider changing them to Caitlyn. And one will have to change from a Cul-De-Sac to a Cul-De-Sackless." (Van Loon Decl. Ex. 15, ECF No. 70-3 at 63.) Later that day, at approximately 1:34 p.m., (MSJ 7), writer Kutner submitted a joke for that night's *Conan* monologue, which O'Brien later performed, stating "Some cities that have streets named after Bruce Jenner are trying to change the streets' names to Caitlyn Jenner. If you live on Bruce Jenner cul-de-sac it will now be cul-de-no-sack." (Van Loon Decl. Ex. 17, ECF No. 70-3 at 72.)

A little over one month later, on July 22, 2015, Plaintiff filed his initial Complaint against Defendants for Copyright Infringement. (ECF No. 1.) Defendants filed Answers, (ECF Nos. 3, 11), and the case proceeded to discovery. Plaintiff recently amended his Complaint, (ECF No. 58); Defendants filed an Answer, (ECF No. 58), and subsequently Moved for Summary Judgment, or Partial Summary Judgment and/or Summary Adjudication, (ECF No. 70).

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(a), a party may move for summary judgment as to a claim or defense or part of a claim or defense. Summary judgment is appropriate where the Court is satisfied that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Material facts are those that may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine dispute of material fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* When the Court considers the evidence presented by the parties, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.

The initial burden of establishing the absence of a genuine issue of material fact falls on the moving party. *Celotex*, 477 U.S. at 323. The moving party may meet this burden by identifying the "portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' " that show an absence of dispute regarding a material fact. *Id.* When a party seeks summary judgment as to an element for which it bears the burden of proof, "it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial." *See C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (quoting *Houghton v. South*, 965 F.2d 1532, 1536 (9th Cir. 1992)).

Once the moving party satisfies this initial burden, the nonmoving party must identify specific facts showing that there is a genuine dispute for trial. *Celotex*, 477 U.S. at 324. This requires "more than simply show[ing] that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, to survive summary judgment, the nonmoving party must "by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts' " that would allow a reasonable fact finder to return a verdict for the non-moving party. *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 248. The non-

moving party cannot oppose a properly supported summary judgment motion by "rest[ing] on mere allegations or denials of his pleadings." *Anderson*, 477 U.S. at 256.

# ANALYSIS

Defendants move for summary judgment on five grounds:

(1) Kaseberg failed to produce valid registrations for two of his allegedly infringed works, and thus, Kaseberg lacks standing to assert infringement claims related to those works; (2) the Conan Defendants created two of their allegedly infringing works prior to Kaseberg's initial publication, and thus, could not have infringed Kaseberg's works as a matter of law; (3) Kaseberg lacks any evidence that Defendants directly copied his allegedly infringed works, and cannot establish that Defendants accessed his allegedly infringed works; (4) Kaseberg's allegedly infringed works are entitled to, at best, "thin' copyright protection, and he cannot establish that the allegedly infringing works are "virtually identical" to his works; and (5) the Conan Defendants independently created their allegedly infringing works.

(Defs.' Notice of Mot. 1, ECF No. 70.) In the alternative, Defendants request summary adjudication on the following issues:

[(1)] All of Kaseberg's allegedly infringed works at issue in this lawsuit are entitled to "thin" copyright protection, and therefore the proper standard of comparison for infringement in this case is "virtually identical;" and [(2)] Kaseberg failed to establish that Defendants willfully infringed any copyrights asserted in this action, and therefore any and all claims of willful copyright infringement raised by Kaseberg must be dismissed.

(*Id.* at 1–2.) The Court addresses each generally in turn, beginning with the issues presented for summary judgment, but collapsing into one inquiry Defendants' moving points (3) and (4) for summary judgment and moving point (1) for summary adjudication, (*infra* Part III).

## I.    Registration of the Tom Brady and UAB Jokes

Defendants first move for summary judgment regarding the Tom Brady and UAB jokes, arguing that Plaintiff lacks standing to maintain an infringement action as to those jokes. This is because "no civil action for infringement of the copyright in any United

7

States work shall be instituted until preregistration or registration of the copyright claim has been made[,]" 17 U.S.C. § 411(a), and at the time Defendants filed their Motion for Summary Judgment Plaintiff had not produced any registration documents for either the Tom Brady Joke or the UAB Joke. (MSJ 8–9.) Plaintiff counters by attaching to his Opposition applications for each joke, (Lorenzo Decl Exs. 7, 8, ECF No. 97-2 at 29–35), and noting that his Amended Complaint clearly indicates that "applications for each of the" relevant jokes were either filed or "pending with the Copyright Office." (Am. Compl. ¶ 26, ECF No. 58.) Defendants respond that Plaintiff never produced "copyright applications for the Tom Brady or UAB [j]okes until February 8, 2017—<u>four months</u> after the close of discovery"—and that therefore Plaintiff should not now be able to rely on those documents. (Reply 1–2 (emphasis original).) Plaintiff responds that the late production was merely "inadvertent[]" and harmless because the application "was in fact filed and [Defendants] were on notice of the filing." (Pl.'s Resps. to Defs.' Evid. Obj. 4–6, ECF No. 114 at 4–6.) Finally, pursuant to the Court's request at oral argument, (Hr'g Tr. 53:10–54:25), Plaintiff and Defendants both submitted supplemental briefing on whether Plaintiff's failure to timely disclose the applications should be outcome-determinative. The Court concludes it should not be.

Federal Rule of Civil Procedure 26(a) requires a party to provide all other parties with certain information, including documents the party "may use to support its claims or defenses." *Id.* at (a)(1)(A)(ii). Additionally, when a party has made a disclosure or response under Rule 26(a), the Party has a continuing duty to "supplement or correct its disclosure or response" if "the party learns that in some material respect the disclosure or response is incomplete or incorrect." *Id.* at (e). Compliance with these provisions of Rule 26 are in part ensured through Rule 37(c), which mandates that "[i]f a party fails to provide information . . . as required by Rule 26(a) or (3), the party is not allowed to use that information . . . to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Rule 37(c) works "as a 'self-executing,' 'automatic' sanction to 'provide[ ] a strong inducement for disclosure of material . . . .' " *Yeti by Molly, Ltd. v.*

*Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001) (quoting federal rule advisory committee notes). "Courts have upheld the use of the sanction even when a litigant's entire cause of action or defense has been precluded." *Id.* (citing *Ortiz–Lopez v. Sociedad Espanola de Auxilo Mutuo y Beneficiencia de P.R.*, 248 F.3d 29, 35 (9th Cir. 2001)).

In the present case, there is no question that Plaintiff failed to timely produce the required disclosures; Defendants specifically propounded discovery in the form of "all DOCUMENTS relating to the application and/or registration of the JOKES AT ISSUE with the United States Copyright Office." (Pl.'s Resp. to Conaco, LLC's First Set of Reqs. For Produc. of Docs. and Things ("Appl. Req.") 9, ECF No. 73 at 88; *see generally* Pl.'s Supp. Br., ECF No. 127.) And Plaintiff concedes that such failure was not substantially justified. (*See generally, e.g.*, Pl.'s Supp. Br. (nowhere arguing that failure to produce was substantially justified).) Accordingly, the only question is whether Plaintiff's failure is "harmless" within the meaning of Rule 37(c). The Court ultimately concludes that it is.

Defendants make valid arguments as to why they were prejudiced by Plaintiff's failure to produce the relevant applications and corresponding documents. For example, there are several potentially dispositive grounds on which Defendants could have conducted discovery. (Defs.' Supp. Br. 7–8, ECF No. 124 (noting, e.g., that an incomplete application does not confer standing; that an application with multiple works including one, previously registered work is invalid as a whole; and that fraud on the Copyright Office can invalidate an application).) However, Plaintiff is correct that here Defendants are not prejudiced in the most meaningful sense—Plaintiff did, in fact, submit applications which in turn confer Plaintiff with standing for the relevant jokes under *Cosmetic Ideas, Inc. v. IAC/InteractiveCorp.*, 606 F.3d 612, 621 (9th Cir. 2010). Accordingly, all prejudice to Defendants springs from what they <u>might</u> discover regarding the applications, as well as the fact that they <u>might</u> have allocated resources differently in evaluating on which grounds to argue this Motion for Summary Judgment.

But Defendants are correct that they should be permitted to reopen discovery regarding the relevant applications, associated documents, and communications from the

Copyright Office. Further, if Defendants discover fatal deficiencies in Plaintiff's applications then Defendants should also again be permitted to move for Summary Judgment on those discrete grounds. And although the Ninth Circuit has held that "modifications to the court's and the parties' schedules supports a finding that the failure to disclose was not harmless[,]" *Hoffman v. Constr. Protective Servs., Inc.*, 541 F.3d 1175, 1180 (9th Cir. 2008) (citing *Wong v. Regents of the Univ. of Cal.*, 410 F.3d 1052, 1062 (9th Cir. 2005)), *as amended* (Sept. 16, 2008), the Court nonetheless finds that in the present case Plaintiff's failure was harmless within the meaning of Rule 37(c). *See Dey, L.P. v. Ivax Pharm., Inc.*, 233 F.R.D. 567, 571 (C.D. Cal. 2005) ("In determining whether to preclude introduction of evidence pursuant to Federal Rule of Civil Procedure 37, courts consider (1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence, and (5) the nondisclosing party's explanation for it[s] failure to disclose the evidence." (citing *S. States Rack & Fixture, Inc. v. Sherwin–Williams Co.*, 318 F.3d 592 (4th Cir. 2003))); *Homeland Housewares, LLC v. Sharkninja Operating LLC*, No. CV1403954DDPMANX, 2016 WL 1698254, at *4 (C.D. Cal. Apr. 27, 2016) (same). Specifically, the amount of prejudice to Defendants is unclear at this point, and reopening discovery and permitting a late-filed dispositive motion—if warranted—sufficiently neutralizes any potential prejudice Defendants may have suffered.

Given the foregoing, the Court concludes that Plaintiff's failure to disclose the relevant applications and additional materials regarding the Tom Brady and UAB jokes is harmless insofar as it relates to Plaintiff's standing to bring suit. Accordingly, Defendants' Motion for Summary Judgment on this ground is **DENIED**. However, Plaintiff and Defendants **SHALL** meet and confer regarding these issues and, if possible, submit to the Court a Joint Motion to reopen discovery and modify the operative pre-trial schedule.

/ / /

/ / /

/ / /

## II.     Prior Creation of the Delta and Washington Monument Jokes

Defendants move for summary judgment regarding both the Delta and Washington Monument jokes because Defendants created those jokes prior to Plaintiff posting his version of those jokes. (MSJ 10.) Because the factual circumstances underlying each joke are distinct, the Court first addresses the Delta Joke and then turns to the Washington Monument Joke.

Regarding the Delta Joke, Defendants' record evidence demonstrates that Conan writer Josh Comers submitted the Delta Joke via email on January 14, 2015 at either 11:33 or 11:32 a.m. (Comers Decl. Ex. 2, ECF No. 70-8 at 24; Hayes Decl. Ex. 1, ECF No. 70-12 at 7.) Nearly five hours later, at 4:14 p.m., Plaintiff posted his version of the joke. (Van Loon Decl. Ex. 23, 5, ECF No. 70-3 at 95.) Despite this strong evidence of prior creation, Plaintiff argues that several "alleged 'coincidences' do not add up [such that] there exists a triable issue of fact as to whether Defendants did in fact write Joke #2 first." (Opp'n 9.) The Court disagrees.

Plaintiff points to four particular "coincidences" that establish a genuine issue of material fact regarding prior creation of the Delta Joke: (1) Conan's "final meeting where jokes are finalized go all the way up until 'showtime[,]' " i.e., 4:30 p.m.; (2) Conan used a similar joke on the previous day's show, and Plaintiff has "never seen *Conan* use premises like that on back to back days[;]" (3) the two copies of the Comers email before the Court have varying timestamps (11:33 a.m. versus 11:32 a.m.) and one email is truncated; and (4) Conan's writer's assistant testified that January 14, 2015 "was the weird day." (Opp'n 7–9.) But none of these is sufficient to inject a genuine issue of material fact into the question whether Defendants created their version of the Delta Joke prior to Plaintiff's version. Specifically, if the email is true, then the exact hour of *Conan*'s taping is irrelevant; Defendants' creation of the joke predated Plaintiff's creation regardless. And the mere facts that Plaintiff had never seen *Conan* use back-to-back premises before and Conan's writer's

/ / /

/ / /

assistant said January 14, 2015 was "the weird day"[1] are insufficient to create a genuine question regarding the validity of the email. Thus, the only remaining evidence is the one-minute discrepancy between the email timestamps and the truncation of one of the messages. However, Defendants explain the time discrepancy "is due to the separate internal clocks of the email archival system and Comers' email program," and the truncation is due to one email being merely "a preview among a list of results." (Reply 2–3; *see also* Hayes Decl. Exs. 1–2, ECF No. 106-3.) Given these simple, reasonable explanations, the Court concludes there is no genuine issue of material fact that Defendants created the Delta Joke prior to Plaintiff's version, and therefore **GRANTS** Defendants' Motion for Summary Judgment as to the Delta Joke.

Regarding the Washington Monument Joke, Defendants again argue that they created the Washington Monument Joke prior to Plaintiff's first posting of his version of the joke. However, unlike with the Delta Joke, Defendants here argue that *Conan* aired a <u>similar</u> joke "which had the same concept and punchline as [Plaintiff's] joke" approximately a year prior to Plaintiff's first publication. (MSJ 10.) Plaintiff argues that there is a genuine dispute as to whether the year-old *Conan* joke was, in fact, "the same joke" as Plaintiff's, given that the year-old joke was (1) in video, rather than written, form and (2) not based on the news story that was the foundation of both Plaintiff's allegedly infringed-upon joke and Defendants' allegedly infringing joke. The Court agrees with Plaintiff.

As an initial matter, as to the allegedly infringing and infringed-upon jokes, there is no dispute that Plaintiff posted his version of the Washington Monument Joke prior to Defendants' use or alleged creation of their version. And, although Defendants contend that Plaintiff "does not mention a study in his joke[,]" (Reply 3), both jokes unquestionably

---

[1] Further, the full excerpt from Ms. Weisberg's (Conan's writer's assistant) deposition reads: "A: Oh, this was the weird day. I'm sorry, there was no Approved Monologue Batch 1 on this day. Q: Why? A: Because Conan's assistant was away . . . ." (Weisberg Dep. 110:4–7, ECF No. 101-8 at 8.) The only reasonable reading of this full excerpt is that the day was "weird" because the show's usual routine was broken. This has nothing to do with the veracity of the emails before the Court.

reference the same study, (*see* MSJ 5 (noting Plaintiff's version says "The Washington Monument is ten inches shorter <u>than previously thought</u>" and Defendants' version says "Yesterday surveyors[] announced that the Washington Monument is ten inches shorter than what's been previously recorded") (emphasis added)). By contrast, Defendants' year-old joke simply references a cold front hitting Washington D.C. before showing a purported "time-lapse . . . of the cold front hitting the Washington Monument" in which the Monument shrank over time. (*Id.* at 5–6.) Accordingly, the common threads between all of the jokes are merely the ideas that (1) the Washington Monument looks like a phallus and (2) the Monument may therefore respond to cold weather by shrinking. However, ideas are not copyrightable. *E.g.*, *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 556 (1985) (noting that the "idea/expression dichotomy 'strike[s] a definitional balance between the First Amendment and the Copyright Act by permitting free communication of facts while still protecting an author's expression' " (alteration original) (quoting *Harper & Row Publishers, Inc. v. Nation Enters.*, 723 F.2d 195, 203 (2d Cir. 1983))). And in any case, the allegedly infringing and infringed-upon jokes both focus on expression of these common ideas as they relate to the then-recent study establishing the Monument's ten-inch decrease. This is a specific expression the year-old joke did not share, and is therefore sufficient to create a triable issue of fact regarding the Washington Monument Joke and whether the year-old joke qualifies as prior creation. Accordingly, the Court **DENIES** summary judgment on this point.

## III.   Direct Copying; Access; and the Relevant Standard of Similarity

Defendants assert that Plaintiff lacks any evidence of direct copying, (MSJ 10), something Plaintiff does not dispute, (*see* Opp'n 7 ("Kaseberg Need Not Present Evidence of Direct Copying")). Accordingly, the only question is whether Plaintiff raises a genuine issue of fact regarding (A) Defendants' access to Plaintiff's allegedly infringed-upon jokes and (B) the similarity between Plaintiff's allegedly infringed-upon jokes and Defendants' allegedly infringing jokes. *E.g.*, *Rice v. Fox Broad. Co.*, 330 F.3d 1170, 1174 (9th Cir. 2003) (noting copying "may be established by showing that . . . [(1)] the infringing party

'had access' to the copyrighted work" and "[(2)] the works in question 'are substantially similar in their protected elements' " (quoting *Metcalf v. Bochco*, 294 F.3d 1069, 1072 (9th Cir. 2002))); (Opp'n 9–15). The Court addresses each component in turn.

### A. Access

To show access, a plaintiff generally must show that a defendant had a "reasonable opportunity" to view a plaintiff's work. *Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 482 (9th Cir. 2000). That is, "[t]here must be a reasonable possibility of viewing the plaintiff's work—not a bare possibility." *Id.* (quoting 4 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 13.02[A], at 13–19 [hereinafter *Nimmer*]). This may be established in two ways, by showing "(1) a particular chain of events . . . between the plaintiff's work and the defendant's access to that work . . . , or (2) the plaintiff's work has been widely disseminated." *Id.* Additionally, access may be inferred based solely on proof of "striking similarity." 3 *Nimmer* § 13.01[B]; *Bernal v. Paradigm Talent & Literary Agency*, 788 F. Supp. 2d 1043, 1052 (C.D. Cal. 2010). The parties agree to these standards, but disagree regarding their application. Because the Court concludes there is a genuine issue of material fact regarding access via a chain of events, the Court **DENIES** Defendants' Motion for Summary Judgment on this point and does not reach wide-spread dissemination or striking similarity.

Defendants argue not just that access proven via chain of events must give rise to more than a bare possibility, but that proof of such access must be " 'significant, affirmative, and probative.' " (MSJ 11 (quoting *Bernal*, 788 F. Supp. 2d at 1054).) And while it is true that both the *Bernal* Court and at least one other central district court have adopted such a standard, *Loomis v. Cornish*, No. CV 12-5525 RSWL JEMX, 2013 WL 6044345, at *5 (C.D. Cal. Nov. 13, 2013), *aff'd on other grounds*, 836 F.3d 991 (9th Cir. 2016), this Court currently looks only for a genuine issue of material fact as to whether Defendants had a reasonable, rather than bare, possibility of viewing Plaintiff's works. "At times, distinguishing a 'bare' possibility from a 'reasonable' possibility will present a close question." *Three Boys Music Corp.*, 212 F.3d at 482. For instance, "[e]vidence that a third

party with whom both the plaintiff and defendant were dealing had possession of plaintiff's work is sufficient to establish access by the defendant." *Loomis v. Cornish*, 836 F.3d 991, 995 (9th Cir. 2016) (quoting 4 *Nimmer* § 13.02[A]).

Defendants again argue that the majority of Plaintiff's evidence presented in opposition was not available, and that, "[h]aving taken a firm position as to his access evidence, which directly impacted Defendants' discovery efforts, [Plaintiff] cannot now ambush Defendants with new facts, theories, and evidence for the first time in his Opposition." (Reply 5.) However, the Court need not use this evidence to find a genuine issue of material fact. Plaintiff supplies an expert report[2] which indicates the probability of "[t]he clustering of the four 'overlapped' jokes" between Plaintiff and Defendant[s] is somewhere between .003% and .0075%." (Lorenzo Decl. Ex. 22, ECF No. 97-2, at 73–78.)[3] And although Defendants highlight that this does not account for other instances where Plaintiff and Defendants arrived at the same joke and Defendants were the first to create, (Reply 4), a comparison of Defendants' cited jokes generally reveals only similarity

---

[2] In an attachment to their Reply Memorandum, Defendants separately move to strike this expert report due to the expert (1) relying only on Plaintiffs' provided instances of joke overlap; (2) not considering any examples of overlap where Defendants created the joke first; (3) not considering any examples of overlap outside of the May-November time period; and (4) not considering overlap relating to jokes that never made it on the *Conan* show. (Defs.' Evi. Obj. and Request to Strike Portions of the Decl. of Jason M. Lorenzo 9–11, ECF No. 106-5.) However, such an attack is more appropriately presented in a formal motion, rather than a few paragraphs of an attachment to a Reply in Support of a Motion for Summary Judgment. Further, "[s]haky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1044 (9th Cir. 2014). Plaintiff demonstrates the expert report is reliable and relevant and thus should be admitted, (*see, e.g.*, *id.* at 1043–55; ECF No. 116; Fed. R. Evi. 702); Defendants' arguments do not, at least at this time, convince the Court otherwise.

[3] Plaintiff puts forth another seemingly strong argument, that although Defendants argue that none of the writers "had ever heard of Kaseberg, visited Kaseberg's blog or twitter page, or seen any of Kaseberg's jokes at issue prior to the alleged infringement[,]" (MSJ 20), writer Comers "admitted in deposition that he was irritated and frustrated that someone like Kaseberg would be accusing them of stealing, and even referred to Kaseberg as a 'non-professional, middle-aged wanna-be writer.' " (Pl.'s Undisputed Facts ¶ 161, ECF No 101-1 at 68.) Plaintiff is correct that this would directly refute Defendants' assertion that none of the writers had ever even heard of Plaintiff. (Opp'n 4.) But just one page earlier in the deposition, Comers testified he "talked to Mr. Sweeney, and . . . learned" from Sweeney "that [Plaintiff] wasn't some young kid," but "was 50 years old, and . . . had claimed to be a seasoned writer." (Comers Dep. 51:5–11.) This surrounding context completely undercuts this aspect of Plaintiff's access-based argument.

of broad ideas, with three jokes arguably being exceptions. (*Compare* Van Loon Decl. Ex. 34, *with* Kutner Decl. Ex. 3; Hayes Decl. Exs. 10, 12.) Further, Defendants' cited joke examples all occur within the window of August 3, 2015 to December 1, 2016—after the time period relevant to Plaintiff's allegations. Accordingly, the Court is left with expert testimony indicating that the probability of independent creation for the jokes and specific time period here at issue is between .003% and .0075%.

This probability evidence is in turn bolstered by the fact that Kaseberg tweeted writer Sweeney after he saw Conan perform allegedly infringing joke number 2, and that Sweeney received the tweet and "read it as someone was saying we took one of his jokes." (*See* Sweeney Dep. 55:1–58:24, ECF No. 101-4 at 6–10.) "And then . . . a couple of days later another writer came to [Sweeney] and said, 'Hey, this guy, Alex Kaseberg, tweeted at me about saying we did one of his jokes.' " (*Id.*) Finally, Sweeney explained that some time in that "early stage . . . [Sweeney] talked to a group of writers in a meeting." (*Id.* at 60:20–24; *see also* Kaseberg Decl. Ex. 9, ECF No. 97-3 at 43 ("At one point Mike Sweeney said, after he got my message, he went on my blog and he saw the jokes . . . .").) Together, this evidence establishes that: (1) the probability of multiple independent creations in such a tight timeframe, at least according to one expert, is highly statistically improbable; (2) at least two *Conan* writers were on notice that someone on Twitter was either implying or asserting that the *Conan* staff was copying his jokes; (3) one writer thought this development was of enough moment to discuss it with another writer; and (4) a separate group of writers was also likely on notice regarding Plaintiff and his accusations early in the relevant timeline. While not overwhelming, this nonetheless suffices to create a genuine issue of material fact as to whether Defendants had a reasonable, rather than bare, possibility of accessing Plaintiff's jokes. And Defendants' additional arguments at the hearing do not persuade the Court otherwise.

Specifically, Defendants at the hearing contested the access point primarily on the grounds that access to a person is insufficient to create a genuine dispute of material fact regarding access to a specific work. (Hr'g Tr. 28:24–31:24; 33:15–34:3.) However, the

cases Defendants cite in support either dealt with companies where individuals were not part of the same department, *e.g.*, *Bernal*, 788 F. Supp. 2d at 1058 (talent agent and literary agent described as "distant colleagues"), or involved only one work, *Art Attacks Ink, LLC v. MGA Entm't Inc.*, 581 F.3d 1138, 1141–42 (9th Cir. 2009) (character design), usually of much greater magnitude, such as a screenplay or novel, *e.g.*, *id.* (screenplay); *Jason v. Fonda*, 526 F. Supp. 774, 775 (C.D. Cal. 1981), *aff'd*, 698 F.2d 966 (9th Cir. 1982) (book and motion picture). By contrast, in the present case there are approximately eight *Conan* writers, (*see* Hr'g Tr. 50:2–50:5; Sweeney Decl. ¶ 3, ECF No. 70-5 at 2), who all work very closely together, (*see, e.g.*, O'Brien Decl. ¶ 4–6, ECF No. 70-11 at 2–3), and there are allegations of <u>five</u>, close-in-time infringements combined with early notice to Defendants of Plaintiff and his online fora containing his jokes. And these two-line, current-events–based jokes implicate different access concerns than an entire screenplay or novel. Each joke was only comedically viable for a very short period, and an alleged infringer could have copied the joke in mere seconds, or even have later done so subconsciously after earlier reading the joke. This is in stark contrast to an entire screenplay or novel, which would remain creatively viable for an extended period and take much longer for an alleged infringer to absorb; in such cases the access window—and potential for discovering proof of such access—necessarily stretches longer. *E.g.*, *Art Attacks*, 581 F.3d at 1144 (three-year window where access could have occurred, and three additional years where underlying work could have gained notoriety and dissemination). Ultimately, the issue of access is tied closely to the facts, *see Three Boys Music Corp.*, 212. F.3d at 482, and the caselaw supports these unique facts, combined with the others listed above, as warranting further development at trial. *See Bernal*, 788 F. Supp. 2d at 1056 ("Instead, to avoid summary judgment, a plaintiff must show that he submitted his work to an intermediary who is in a position to transmit the plaintiff's work to the creators of the infringing work." (emphasis removed)); *cf. Three Boys Music Corp.*, 212 F.3d at 482–85 (recognizing, albeit within the context of a widespread dissemination theory of access, that "subconscious

/ / /

copying" is a viable access theory that is necessarily tied to the level of similarity between the works).

Finally, although Defendants at the hearing further argued that the expert report was targeted towards independent creation only, and therefore is inapposite regarding any inference of an access theory, (*id.* at 47:22–49:1), as explained *infra* Part IV, independent creation and access are interrelated. Of course, the expert report alone would be insufficient to prove access because it merely undercuts any theory of independent creation without advancing any specific theory of access. However, as detailed above, the expert report in this case is bolstered by the fact that there were several writers on notice of Plaintiff, his allegations, and the online fora containing his jokes; and at least several of the writers were together discussing those matters. Accordingly, the expert report here bolsters this additional evidence in a meaningful way.

Although this is a unique case and a close call, taking the foregoing in concert, and drawing all reasonable inferences in favor of Plaintiff, the Court cannot at this time say that as a matter of law Defendants did not have access to Plaintiff's jokes. Therefore, the Court **DENIES** Defendants' Motion for Summary Judgment on these grounds.

### *B. Similarity*

Unlike access, the Parties do not agree regarding the appropriate standard for evaluating the level of similarity between the works here at issue. This disagreement mostly concerns the amount of protection Plaintiff's works should be afforded. Defendants argue Plaintiff's work is comprised almost wholly of unprotectable elements and therefore is entitled to only "thin" copyright protection, (MSJ 13–20); Plaintiff disagrees, (Opp'n 15–23). Although largely a novel question, the Court agrees with Defendants.

"To determine whether two works are substantially similar, a two-part analysis—an extrinsic test and an intrinsic test—is applied." *Rice*, 330 F.3d at 1174 (citing *Metcalf*, 294 F.3d at 1073). " 'For summary judgment, only the extrinsic test is important.' " *Id.* (quoting *Kouf v. Walt Disney Pictures & Television*, 16 F.3d 1042, 1045 (9th Cir. 1994)).

/ / /

"[T]he extrinsic test is an objective measure of the 'articulable similarities between the plot, themes, dialogue, mood, setting, pace, characters, and sequence of events.' " *Id.* However, "[b]ecause only those elements of a work that are protectable and used without the author's permission can be compared when it comes to the ultimate question of illicit copying, we use analytic dissection to determine the scope of copyright protection before works are considered 'as a whole.' " *Apple Computer, Inc. v. Microsoft Corp.*, 35 F.3d 1435, 1443 (9th Cir. 1994). Specifically, analysis flows as follows:

> (1) The plaintiff must identify the source(s) of the alleged similarity between his work and the defendant's work.
>
> (2) Using analytic dissection, and, if necessary, expert testimony, the court must determine whether any of the allegedly similar features are protected by copyright. . . . . [U]nprotectable ideas must be separated from potentially protectable expression; to that expression, the court must then apply the relevant limiting doctrines in the context of the particular medium involved, through the eyes of the ordinary consumer of that product.
>
> (3) Having dissected the alleged similarities and considered the range of possible expression, the court must define the scope of the plaintiff's copyright—that is, decide whether the work is entitled to "broad" or "thin" protection. Depending on the degree of protection, the court must set the appropriate standard for a subjective comparison of the works to determine whether, as a whole, they are sufficiently similar to support a finding of illicit copying.

*Id.* at 1443 (emphasis removed). "Where a copyrighted work is composed largely of 'unprotectable' elements, or elements 'limited' by 'merger,' '*scenes a faire*,' and/or other limiting doctrines, it receives a 'thin' rather than a 'broad' scope of protection." *Idema v. Dreamworks, Inc.*, 162 F. Supp. 2d 1129, 1178 (C.D. Cal. 2001), *aff'd in relevant part, dismissed in part*, 90 F. App'x 496 (9th Cir. 2003), as amended on denial of reh'g (Mar. 9, 2004). This is because " 'similarities derived from the use of common ideas cannot be protected; otherwise, the first to come up with an idea will corner the market.' " *Rice*, 330 F.3d at 1175 (9th Cir. 2003) (quoting *Apple Computer*, 35 F.3d at 1443). At least in the

context of software and commercial photography, the Ninth Circuit has determined that "virtual identity" is the appropriate standard when a plaintiff's work is entitled to only "thin" protection. *Apple Computer*, 35 F.3d at 1439 ("When the range of protectable and unauthorized expression is narrow, the appropriate standard for illicit copying is virtual identity."); *Ets-Hokin v. Skyy Spirits, Inc.* ("*Skyy Spirits II*"), 323 F.3d 763, 766 (9th Cir. 2003) (" '[W]hen the range of protectable [. . .] expression is narrow, the appropriate standard for illicit copying is virtual identity.' " (quoting *Apple Computer*, 35 F.3d at 1439)); *see also id.* (noting that virtual identity is the appropriate standard of similarity when a plaintiff holds a thin copyright because " '[t]he less developed the characters, the less they can be copyrighted; that is the penalty an author must bear for marking them too indistinctly.' " (quoting *Nichols v. Universal Pictures Corp.*, 45 F.2d 119, 121 (2d Cir. 1930) (Hand, J.))).

Plaintiff in the present case points out that "[t]he cases Defendants have cited do not directly deal with jokes[,]" (Opp'n 17); but neither do Plaintiff's cited cases, (*see id.* at 17–20). However, the copyrighted items in Defendants' cited cases and the two-line jokes here at issue do share the same issue-controlling feature: an extremely limited amount of protectable content. For instance, in *Skyy Spirits* a photographer brought suit against the Skyy Corporation for infringement of his photographs for a Skyy advertising campaign which placed "[t]he [Skyy Vodka] bottle . . . in front of a plain white or yellow backdrop, with back lighting[;]" "illuminated from the left (from the viewers['] perspective), such that the right side of the bottle is slightly shadowed[;]" and where "[t]he angle from which the photos were taken appear[ed] to be perpendicular to the side of the bottle, with the label centered, such that the viewer has a 'straight on' perspective." *Ets-Hokin v. Skyy Spirits, Inc.*, 225 F.3d 1068, 1071–72 (9th Cir. 2000). After an initial Ninth Circuit panel held that the photographs were sufficiently original to merit copyright protection, *id.* at 1070, a subsequent panel upheld a grant of summary judgment applying the "virtual identity" standard to the photographs at issue. *Skyy Spirits II*, 323 F.3d at 764–66 ("This long-running litigation is fundamentally about how many ways one can create an advertising

1   photograph, called a 'product shot,' of a blue vodka bottle. We conclude there are not very
2   many."). The *Skyy Spirits II* panel articulated the distinction for that case as follows: "the
3   range of protectable expression is constrained by both the subject-matter idea of the
4   photograph and the conventions of the commercial product shot." *Id.* at 766; *see also Apple*
5   *Computer*, 35 F.3d at 1447 (noting "virtually identical" standard applies when "almost all
6   the similarities spring . . . from basic ideas and their obvious expression").

7       In the present case, there is little doubt that the jokes at issue merit copyright
8   protection. *See, e.g.*, *Feist*, 499 U.S. at 345 (noting originality requires only independent
9   creation of a work that "possess[es] some creative spark, 'no matter how crude, humble or
10  obvious' it might be" (quoting 1 *Nimmer* § 1.08[C][1])); *Bleistein v. Donaldson*
11  *Lithographing Co.*, 188 U.S. 239, 251 (1903) ("It would be a dangerous undertaking for
12  persons trained only to the law to constitute themselves final judges of the worth of
13  [creative works], outside of the narrowest and most obvious limits."). However, like the
14  pictures in *Skyy Spirits*, the jokes here are similarly constrained by their subject matter and
15  the conventions of the two-line, setup-and-delivery paradigm. Each joke begins with a
16  factual sentence and then immediately concludes with another sentence providing
17  humorous commentary on the preceding facts. Facts, of course, are not protected by
18  copyright. *Feist*, 499 U.S. at 345. And although the punchlines of the jokes are creative,
19  they are nonetheless constrained by the limited number of variations that would (1) be
20  humorous (2) as applied to the specific facts articulated in each joke's previous sentence
21  and (3) provide mass appeal. This merits only thin protection. The standard for
22  infringement must therefore also be some form of "virtual identity."

23      In sum, where on the protection "continuum a particular work falls . . . is a call that
24  must be made case by case." *Apple Computer*, 35 F.3d at 1447. The Court here concludes
25  that Plaintiff's jokes are entitled to only "thin" copyright protection and therefore
26  **GRANTS** Defendants' Motion for Summary Adjudication as to this issue.

27      Given that Plaintiff's works are entitled to only thin protection, the Court must
28  determine whether there is a genuine dispute of material fact regarding whether

Defendants' allegedly infringing jokes are "virtually identical" to Plaintiff's.[4] The court concludes that there is no genuine dispute of material fact regarding the UAB jokes' lack of virtual identity, but that a genuine dispute exists regarding all other jokes. In particular, Plaintiff's and *Conan*'s UAB jokes differ in the particular football team used in the punchline. As already discussed, the factual setup of the UAB discontinuing its football team is not entitled to protection. The protectable aspect in Plaintiff's joke is instead the expression of a fictional version of the Oakland Raiders hearing that news and then commenting "Wait, so you can do that?" (Van Loon Decl. Ex. 10, ECF No. 70-3 at 40.) Defendants' version changes the expression to fans (rather than team members) of a different team—the New York Jets—hearing the news and then commenting "wait, can you do that?" (*Id.* Ex. 12 at 51.) These two differences are significant enough to warrant summary judgment due to objective lack of virtual identity between the protectable elements of the allegedly infringing and allegedly infringed-upon joke. To hold otherwise would grant Plaintiff's UAB Joke the power to preclude any expression of disbelief and desire for a beloved but beleaguered sports team to also shut down their operations upon hearing the UAB news. This would fundamentally impede, rather than "promote the progress of" the creative arts. U.S. Const. art. 1, § 8, cl. 8.

On the other hand, Plaintiff's and *Conan*'s other jokes objectively share sufficient protectable similarities to preclude summary judgment.

The Jenner Joke focuses on Bruce Jenner's then-recent sex change and the resulting effect on towns with streets named "Bruce Jenner." Again, these facts are not

---

[4] At oral argument, Plaintiff argued that only a jury may apply the "virtually identical" standard. (Hr'g Tr. 36:24–38:6.) However, this ignores that in applying the extrinsic test the Court must determine whether the works objectively share "articulable similarities . . . ." *Metcalf*, 294 F.3d at 1073. Virtual identity supplants the usual, overarching substantial similarity standard, and thus is appropriate for the Court to use for purposes of the extrinsic test. *See Apple Computer*, 35 F.3d 1435, 1447 (9th Cir. 1994) (affirming the lower court's analytic dissection and noting that the lower court "correctly concluded that illicit copying could occur only if the works as a whole are virtually identical" (emphasis added)); *Skyy Spirits II*, 323 F.3d at 764 ("We therefore affirm the district court's summary judgment because the allegedly infringing photographs are not 'virtually identical' . . . .").

copyrightable. The protectable expression is instead Plaintiff's observation that one fictional Bruce Jenner street would "have to change from a Cul-De-Sac to a Cul-De-Sackless." (Van Loon Decl. Ex. 15, ECF No. 70-3 at 63.) *Conan*'s joke takes the same tack, noting that: "If you live on Bruce Jenner cul-de-sac it will now be cul-de-no-sack." (*Id.* Ex 17, ECF No. 70-3 at 72.) Although *Conan* changes the punchline from "sackless" to "no-sack," the framing is identical: the change <u>happens</u> to the observer no matter what, and that change is the removal of the sac from "cul-de-sac." Although these jokes are not <u>exactly</u> identical, that is not the test. There is a genuine issue of material fact whether a jury would find these objective similarities to be virtually identical within the context of the entire joke.

The Washington Monument Joke focuses on the Washington Monument having been found to be ten inches shorter than previously established. The protectable expression lies in Plaintiff's observation that the Washington Monument could "suffer[] from shrinkage[,]" (*id.* Ex. 7, ECF No. 70-3 at 30), implying that the Monument is therefore an actual phallus. And although the Defendants are correct that the *Conan* joke differs insofar as it anthropomorphizes the Monument—"Of course, the monument's blaming the shrinkage on the cold weather[,]" (*id.* Ex. 9, ECF No. 70-3 at 35)—the fundamental expression regarding the Monument, in fact, being a phallus remains the same. As previously stated, while not exactly identical, the jokes are sufficiently objectively virtually identical to create a triable issue of fact regarding whether a jury would find these objective similarities to be virtually identical within the context of the entire joke.

Finally, the Brady Joke focuses on Tom Brady's statement after winning Super Bowl XLIX that he wanted "to give his MVP truck to the man who won the game for the Patriots." (*Id.* Ex. 13, ECF No. 70-3 at 55.) Plaintiff's protectable expression is his implication that a fictionalized Tom Brady would therefore give his truck to the coach of the opposing team, Pete Carroll. And although the *Conan* joke takes an active stance—"So Brady's giving his truck to Seahawks coach Pete Carroll[,]" (*Id.* Ex. 14, ECF No. 70-3 at 57)—the fundamental expression is the same, i.e., that there was no doubt Brady would be

giving his MVP award to the opposing team's coach. As previously stated, while not exactly identical, the jokes are sufficiently objectively virtually identical to create a triable issue of fact regarding whether a jury would find these objective similarities to be virtually identical within the context of the entire joke.

Given the foregoing, the Court **GRANTS** summary judgment regarding the UAB Joke, but **DENIES** summary judgment as to the remaining Jenner, Washington Monument, and Brady jokes.[5]

## IV.   Independent Creation

Defendants next argue that they are entitled to summary judgment on the discrete ground that the "evidence presented in this case firmly establishes that the *Conan* Defendants' jokes were independently created." (MSJ 20.) Plaintiff responds that "courts should caution against deciding the issue of independent creation at summary judgment[,]" especially in cases such as this one where the evidence establishing independent creation is solely "the self-interested testimony of those on the defense side . . . ." (Opp'n 23 (quoting 3 *Nimmer* § 12.11[D][1] n.99.5).) Defendants reply that "[c]ourts in the Ninth Circuit can, and do, grant summary judgment based on independent creation." (Reply 8– 10.) The Court agrees with Plaintiff.

As an initial matter, it is true that

[t]he law imposes no prohibition upon those who, without copying, independently arrive at the precise combination of words or notes which have been copyrighted. Stated another way, [i]f A produces identically the same work as B, by independent thought, in good faith, without hearing, or seeing,

---

[5] Defendants in their Reply note that to the extent Plaintiff argues "that O'Brien's ad-libbed language in delivering his jokes should be disregarded in the comparison[,]" to do so would be incorrect because the "Complaint claims infringement by *Conan*'s <u>performances</u>." (Reply 8 (emphasis added).) However, the Court need not reach this issue because the surviving jokes in this section have only minor performance additions that would not here alter the Court's conclusion. (MSJ 5 (Washington Monument Joke additions: "Yeah" and "Penis joke"); 6 (Brady Joke addition: Tom Brady wanting to give MVP truck away is "nice"); 7 (no Jenner Joke additions).)

B's work, both A and B would be entitled to individual copyrights in their individual works.

*Granite Music Corp. v. United Artists Corp.*, 532 F.2d 718, 720 (9th Cir. 1976) (quotation marks and citations removed). However, independent creation is necessarily tied—at least in part—to Plaintiff's evidence of infringement. "Because, in most cases, direct evidence of copying is not available, a plaintiff may establish copying by showing that the infringer had access to the work and that the two works are substantially similar." *Shaw v. Lindheim*, 919 F.2d 1353, 1356 (9th Cir. 1990). Where evidence of access and substantial similarity are lacking, an independent creation defense usually becomes more plausible. And Defendants' cited cases within this Circuit awarding summary judgment all rely on this interrelatedness; i.e., the cases do not award summary judgment based <u>solely</u> on the grounds of independent creation. *See Walker v. Viacom Int'l, Inc.*, No. C 06-4931 SI, 2008 WL 2050964, at *9 (N.D. Cal. May 13, 2008) (holding "that the similarities between the two characters are limited to . . . stock elements . . . and that the dissimilarities are so significant that, as a matter of law, defendants are entitled to summary judgment on plaintiff's claim of copyright infringement[,]" but additionally noting in next sentence that "defendants have submitted extensive and undisputed evidence of defendants' independent creation . . . further supporting summary judgment in favor of defendants"), *aff'd*, 362 F. App'x 858 (9th Cir. 2010); *Payne v. Anvil Knitwear, Inc.*, No. CV 06-8100 SVW SSX, 2007 WL 1953438, at *3 (C.D. Cal. June 27, 2007) ("Anvil has styled its motion as an affirmative defense of 'prior independent creation.' In reality, the motion centers on whether there is a material issue of fact regarding Anvil's alleged 'access' to Plaintiffs' registered copyrights since Anvil created the Anvil Updated Designs years before Plaintiffs' copyrights were fixed."), *aff'd*, 293 F. App'x 475 (9th Cir. 2008); *Stewart v. Wachowski*, 574 F. Supp. 2d 1074, 1098–1104 (C.D. Cal. 2005) (ruling on "striking similarity" grounds but noting close tie to "independent creation" and how evidence of one may affect determination of the other).

/ / /

In the present case, the Delta Joke is the only joke implicating this principle of interrelatedness—email records indisputably prove that Defendants created a version of the allegedly infringing Delta Joke <u>prior</u> to Plaintiff's creation of his allegedly infringed-upon version. This directly (and successfully) attacks Plaintiff's theory of access, and therefore summary judgment as to the Delta Joke is proper. *See, e.g.*, *Christian v. Mattel, Inc.*, 286 F.3d 1118, 1128 (9th Cir. 2002) ("Access is only a theoretical issue in this case, however. By simple logic, it is impossible to <u>copy</u> something that does not exist." (emphasis original)). On the other hand, Defendants' evidence of independent creation for each of the remaining jokes is based exclusively on individual writer declarations and premise sheets alleging from where the factual set up for the jokes came. (Reply 8–9.) These declarations in no way directly refute either access or similarity, but instead merely allege that Defendants created their allegedly infringing jokes <u>notwithstanding</u> any purported similarity or access. This necessarily implicates credibility determinations inappropriate for summary judgment. *E.g.*, 3 *Nimmer* § 12.10[B][2][b] ("To the extent that [a] defendant denies . . . copying and maintains independent creation, a factual issue arises, which it is for trial to resolve."); *Miller v. Miramax Film Corp.*, 2001 U.S. Dist. LEXIS 25967, at *31–32 (C.D. Cal. 2001) ("[T]o avoid making an inappropriate credibility determination at summary judgment . . . the Court declines to grant summary judgment for the defendants based on evidence of independent creation."). Accordingly, the Court **DENIES** Defendants' Motion for Summary Judgment regarding independent creation for all jokes except the Delta Joke.

## V.   Willful Infringement

Defendants' final argument is that they are entitled to summary adjudication regarding whether Defendants' willfully infringed Plaintiff's copyrights. (MSJ 25.) Plaintiff responds that a genuine issue of material exists because Plaintiff tweeted to and spoke with Mike Sweeney (a member of *Conan*'s writing staff) such that "there is evidence that Defendants knew about [Plaintiff] at least after Joke #2." (Opp'n 24–25.) Defendants reply that Sweeney did not write any of the allegedly infringing jokes, and that record

evidence demonstrates that Sweeney only told the writers about Plaintiff "<u>after</u> the jokes at issue were already published." (Reply 10 (emphasis original).) The Court agrees with Plaintiff.

" '[T]o prove "willfulness" under the Copyright Act, the plaintiff must show (1) that the defendant was actually aware of the infringing activity, or (2) that the defendant's actions were the result of "reckless disregard" for, or "willful blindness" to, the copyright holder's rights . . . .' " *Washington Shoe Co. v. A-Z Sporting Goods Inc.*, 704 F.3d 668, 674 (9th Cir. 2012) (quoting *Louis Vuitton Malletier, S.A. v. Akanoc Sols., Inc.*, 658 F.3d 936, 944 (9th Cir. 2011)). "Generally, a determination as to willfulness requires an assessment of a party's state of mind, a factual issue that is not usually susceptible to summary judgment." *UMG Recordings, Inc. v. Disco Azteca Distribs., Inc.*, 446 F. Supp. 2d 1164, 1174 (E.D. Cal. 2006) (quoting *Sega Enters. Ltd. v. MAPHIA*, 948 F. Supp. 923, 936 (N.D. Cal. 1996)). "However, where the relevant facts are admitted or otherwise undisputed, willfulness can be appropriately resolved on summary judgment." *Id.*

In the present case, Mike Sweeney explicitly noted that after his "first communication" with Plaintiff, (Sweeney Dep. 55:1–3, ECF No. 101-4 at 6), "another writer came to me [(Sweeney)] and said, 'Hey, this guy, Alex Kaseberg, tweeted at me about saying we did one of his jokes[,]' " (*id.* at 57:4–13). Sweeney continued that some time in that "early stage, yeah, I talked to a group of writers in a meeting." (*Id.* at 60:20–24.) These statements are in turn bolstered by writer Comers' statement that he learned of Plaintiff's allegations from Mr. Sweeney prior to the litigation, and then later heard that "maybe there was more communication, like he [(Plaintiff)] . . . maybe . . . reached out again to Mike about it." (Comers Dep. 45:21–46:11, ECF No. 106-2 at 64–66.) And although Defendants point to writers Kiley's and Kutner's depositions as indicating that no writer knew of Plaintiff until after the jokes at issue were already published, (Kiley Dep. 62:1–2 ("Mike Sweeney mentioned . . . at a meeting that someone was suing the show."), ECF No. 106-2 at 77; Kutner Dep. 54:1–7 (explaining that meeting with Mike Sweeney where he heard of allegations "had to be after" the lawsuit was filed), ECF No. 106-2 at

57), the most that can be said regarding these depositions is that they add to the general confusion among the writing staff regarding the timeframe during which they learned about Plaintiff and his allegations. This does nothing to dispel, but instead confirms, a genuine issue of material fact regarding whether Defendants may have willfully infringed Plaintiff's works—the writers may well have been on notice as to Plaintiff and his Twitter or blog posts almost immediately following Conan's performance of the second allegedly infringing joke. If Defendants did, in fact, subsequently copy Plaintiffs' other jokes, then there is a genuine fact as to the willfulness of Defendants' so doing. *See Washington Shoe Co.*, 704 F.3d at 674 (quoting with approval the statement that "[t]o prove willfulness, plaintiffs must show that the infringer had actual <u>or constructive knowledge</u> that it was infringing the plaintiffs' copyrights <u>or</u> else <u>acted in reckless disregard of the high probability that it was infringing plaintiffs' copyrights</u>" (emphases added)). Given the foregoing, the Court **DENIES** Defendants' Motion for Summary Adjudication regarding the issue of willful infringement.

## CONCLUSION

Given the foregoing, the Court **GRANTS** Defendants' Motion for Summary Judgment for failure to establish a genuine issue of material fact regarding (1) the UAB Joke and (2) the Delta Joke. The Court **DENIES** Defendants' Motion for Summary Judgment regarding (1) the Washington Monument Joke; (2) the Jenner Joke; and (3) the Tom Brady Joke. Additionally, the Court **GRANTS** Defendants' Motion for Summary Adjudication that the jokes are only entitled to "thin" protection, but **DENIES** Defendants' Motion for Summary Adjudication as to a failure to create a genuine issue of material fact regarding willfulness.

**IT IS SO ORDERED.**

Dated:  May 9, 2017

Hon. Janis L. Sammartino
United States District Judge