1  PATRICIA L. GLASER – State Bar No. 55668
   pglaser@glaserweil.com
2  THOMAS P. BURKE JR. – State Bar No. 288261
   tburke@glaserweil.com
3  JUSTIN P. THIELE – State Bar No. 311787
   jthiele@glaserweil.com
4  GLASER WEIL FINK HOWARD
       AVCHEN & SHAPIRO LLP
5  10250 Constellation Boulevard, 19th Floor
   Los Angeles, California 90067
6  Telephone: (310) 553-3000
   Facsimile: (310) 556-2920
7
   *Attorneys for Defendants*
8

9                    UNITED STATES DISTRICT COURT

10                 SOUTHERN DISTRICT OF CALIFORNIA

11

12  ROBERT ALEXANDER KASEBERG,           CASE NO.: 15-CV-01637-JLS-DHB

13                   Plaintiff,           Hon. Janis L. Sammartino

14  v.                                    **DEFENDANTS' MEMORANDUM
                                          OF CONTENTIONS OF FACT
15  CONACO, LLC; TURNER                   AND LAW**
    BROADCASTING SYSTEM; TIME
16  WARNER, INC.; CONAN O'BRIEN;          TRIAL DATE: May 28, 2019
    JEFF ROSS; MIKE SWEENEY; DOES         PRETRIAL CONFERENCE
17  1-50, inclusive,                      DATE: Feb. 21, 2019
                                          TIME: 1:30 p.m.
18                   Defendants.          COURTROOM: 4D

19

20

21

22

23

24

25

26

27

28

Glaser Weil

# TABLE OF CONTENTS

Page

I.  Contentions of Fact ........................................................................... 1

   A.  Introduction & Parties ................................................................ 1

   B.  *Conan*'s monologue writers craft each show's monologue through a creative and deliberate process........................................... 1

   C.  Kaseberg has accused Defendants of infringing his copyrights to five jokes, three of which remain at issue after summary judgment. ... 5

     1.  The UAB Joke ................................................................ 5

     2.  The Delta Joke .............................................................. 6

     3.  The Tom Brady Joke ...................................................... 7

     4.  The Washington Monument Joke................................... 8

     5.  The Jenner Joke ............................................................ 9

II.  Contentions of Law ......................................................................... 9

   A.  Kaseberg cannot prove either ownership of a valid copyright or infringement by Defendants............................................. 9

     1.  Kaseberg's jokes lack the minimal level of originality required to enjoy copyright protection. .................................. 10

     2.  If copyrightable, Kaseberg's jokes are entitled only to thin protection against virtually identical copying. ........................ 11

     3.  Kaseberg cannot prove that his jokes were copied by Defendants, either directly or indirectly. .................................. 11

       a.  Kaseberg cannot prove that Defendants had a reasonable opportunity to view his jokes. ..................... 12

         (i)  Kaseberg cannot prove a chain of events linking his jokes to *Conan*'s monologue writers.    12

         (ii)  Kaseberg's jokes were not widely disseminated.    13

         (iii)  Kaseberg's jokes are not strikingly similar to those told on *Conan*.    14

       b.  Kaseberg cannot prove that the jokes on *Conan* are virtually identical to his................................................. 14

       c.  The jokes on *Conan* differ substantially from

Kaseberg's in the specific expressions used. .................15

    (i)     The Tom Brady Joke       16

    (ii)    The Washington Monument Joke   17

    (iii)   The Jenner Joke           18

    4.    *Conan*'s monologue writers independently created each of the allegedly infringing jokes. ...................................18

    5.    Kaseberg will be unable to prove direct copyright infringement by Time Warner or TBS. ....................................21

**B.**    Kaseberg is entitled to a minimal award of damages and fees, if any. ...............................................................................................21

    1.    Kaseberg cannot prove that the alleged infringement of any of his jokes was willful. ...........................................21

    2.    Kaseberg's actual damages are minimal at best, and Kaseberg's disgorgement-of-profits theory is remote and speculative. ...............................................................................22

    3.    Kaseberg cannot recover statutory damages or attorney's fees for two of the three jokes at issue, and Defendants intend to seek their fees to the fullest extent possible if they prevail at trial. ............................................................................23

**C.**    Injunctive relief is unwarranted in this action. ....................................25

**III.**    Abandoned Issues ...............................................................................25

**IV.**    Rule 16.1(f)(2)(a) Exhibits ...............................................................26

**V.**    Rule 16.1(f)(1)(a) Witnesses ...........................................................26

# TABLE OF AUTHORITIES

Page

**FEDERAL CASES**

*Apple Computer, Inc. v. Microsoft Corp.,*
35 F.3d 1435 (9th Cir. 1994) ............................................................................. 11

*Art Attacks Ink, LLC v. MGA Entm't Inc.,*
581 F.3d 1138 (9th Cir. 2009) ...................................................................... 12, 13

*Bldg. Graphics, Inc. v. Lennar Corp.,*
708 F.3d 573 (4th Cir. 2013) ............................................................................. 13

*Chafir v. Carey,*
2007 WL 2702211 (S.D.N.Y. Sept. 17, 2007) ................................................. 13

*Data East USA, Inc. v. Epyx, Inc.,*
862 F.2d 204 (9th Cir. 1988) ............................................................................. 15

*Dream Games of Ariz., Inc. v. PC Onsite,*
561 F.3d 983 (9th Cir. 2009) ............................................................................. 24

*Ent. Research Grp., Inc. v. Genesis Creative Grp.,*
122 F.3d 1211 (9th Cir. 1997) ........................................................................... 10

*Ets–Hokin v. Skyy Spirits, Inc.,*
323 F.3d 763 (9th Cir. 2003) ............................................................................. 11

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.,*
499 U.S. 340 (1991) ........................................................................................... 14

*Kamar Intern., Inc. v. Russ Berrie and Co.,*
657 F.2d 1059 (9th Cir. 1981) ........................................................................... 10

*Loomis v. Cornish,*
2013 WL 6044345 (C.D. Cal. Nov. 13, 2013) ................................................. 13

*Mackie v. Rieser,*
296 F.3d 909 (9th Cir. 2002) ............................................................................. 22

*MAI Sys. Corp. v. Peak Computer, Inc.,*
991 F.2d 511 (9th Cir. 1993) ............................................................................. 25

*Maljack Prods., Inc. v. GoodTimes Home Video Corp.,*
81 F.3d 881 (9th Cir. 1996) ............................................................................... 25

*Rice v. Fox Broad. Co.,*
330 F.3d 1170 (9th Cir. 2003) ...................................................................... 10, 12

*Satava v. Lowry,*
323 F.3d 805 (9th Cir. 2003) ...................................................................... 10, 11

*Selle v. Gibb,*
741 F.2d 896 (7th Cir. 1984) ............................................................................. 14

1337195

Glaser Weil

*Sid & Marty Krofft Television Prods., Inc. v. McDonald's Corp.*,
  562 F.2d 1157 (9th Cir. 1977) ..................................................... 12

*Stabile v. Paul Smith Ltd.*,
  137 F. Supp. 3d 1173 (C.D. Cal. 2015) .................................... 13

*Wash. Shoe Co. v. A-Z Sporting Goods Inc.*,
  704 F.3d 668 (9th Cir. 2012) ..................................................... 21

*Wash. Shoe Co. v. A-Z Sporting Goods Inc.*,
  704 F.3d 668 (9th Cir. 2012) ..................................................... 21

**<u>FEDERAL STATUTES</u>**

17 U.S.C. § 102(b) ........................................................................ 10

17 U.S.C. § 412 ............................................................................. 23

17 U.S.C. § 502(a) ........................................................................ 25

17 U.S.C. § 504(a) ........................................................................ 23

17 U.S.C. § 504(b) ........................................................................ 22

17 U.S.C. § 504(c) ........................................................................ 23

17 U.S.C. § 504(c)(2) .................................................................... 21

17 U.S.C. § 505 ............................................................................. 24

**<u>OTHER AUTHORITIES</u>**

Ninth Circuit Model Civil Jury Instructions, 17.14 (2017) ......................... 10

Ninth Circuit Model Civil Jury Instructions, 17.18 (2017) ......................... 12

Ninth Circuit Model Civil Jury Instructions, 17.5 (2017) ........................... 21

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Glaser Weil**

1337195

System, Inc.; Time Warner Inc.; Conan O'Brien; Jeff Ross; and Mike Sweeney (collectively "Defendants") respectfully submit their Memorandum of Contentions of Fact and Law in advance of the pretrial conference scheduled on February 21, 2019, and the jury trial scheduled to begin on May 28, 2019.

## I.   Contentions of Fact

### A.   Introduction & Parties

1. *Conan* is a popular late-night talk show that airs Monday through Thursday on TBS. *Conan* has aired on TBS since 2010.

2. Defendant Conaco, LLC ("Conaco") is the television production company that produces *Conan*. Defendant Turner Broadcasting System ("Turner") owns and operates the TBS television network. Defendant Time Warner Inc. ("Time Warner") is Turner's parent company.

3. Defendant Conan O'Brien ("O'Brien") created and hosts *Conan*. Defendant Jeff Ross ("Ross") is *Conan's* executive producer. Defendant Mike Sweeney ("Sweeney" ) was *Conan's* head writer at all times relevant to this lawsuit.

4. Plaintiff Robert Alexander Kaseberg ("Plaintiff" or "Kaseberg") is a freelance comedy writer who maintains an active blog and Twitter account, where he posts monologue-style jokes on a near-daily basis, sometimes up to dozens each day. Kaseberg records and watches the monologues of each late-night host the morning after they air on television. Indeed, when posting on his blog or Twitter account, Kaseberg attempts to imitate the voice and style of these hosts, including O'Brien, since the purpose of his online presence is to attract the attention of other comedians and writers.

### B.   *Conan's* monologue writers craft each show's monologue through a creative and deliberate process.

5. Like many late-night talk shows, *Conan* begins with a monologue consisting of a few minutes of jokes about the day's news.

1337195

6.     To craft each show's monologue, *Conan* employs a team of four monologue writers. These writers are supported by a writers' assistant, who coordinates their efforts, and a team of interns, who help with finding interesting topics or "premises" for the monologues.

7.     At the times relevant to Kaseberg's allegations, the four monologue writers employed on *Conan* were Brian Kiley, Josh Comers, Rob Kutner, and Laurie Kilmartin. Their assistant at all relevant times was Danielle Weisberg.

8.     Each of the monologue writers arrives at the production offices of *Conan* in Burbank, California, at around 9 a.m. on weekdays.

9.     On Mondays through Thursdays, they must craft the monologue of the show that is to be taped that afternoon and aired that evening.

10.     For the first hour or so of the day, the writers focus on finding "premises"—interesting and timely news stories that seem ripe for humor. Each writer visits a short list of specific preferred websites to source his or her premises. The monologue writers do not research social media profiles, conduct general Google searches, or review content on other comedians' blogs, social media, or personal websites for their premises research.

11.     By 10 a.m., the writers submit the premises that they have found so far to their assistant, Weisberg, who collects and assembles the premises from the different writers. Meanwhile, a team of interns has also been searching for promising premises and forwarding them, with links to their sources, to Weisberg. Weisberg compiles and circulates a complete set of premises to the writers at around 10 a.m.

12.     From 10 a.m. until around noon, the monologue writers work on the first batch of monologue jokes—"Batch 1."

13.     Most monologue jokes follow a similar setup-and-punchline format: the setup—the premise—is a factual snippet from the day's news. The punchline then provides a humorous, surprising, or ironic twist on the factual setup.

Glaser Weil

14.     Each monologue writer tries to draft 10–20 such jokes before submitting his or her Batch 1 jokes to Weisberg at around noon.

15.     Most of the Batch 1 process is solitary: the writers tend to work on the jokes in the privacy of their own offices, with the exception of Brian Kiley and Josh Comers, who usually bounce ideas off each other for about 20-30 minutes.

16.     After all the writers have submitted their Batch 1 jokes, Weisberg assembles them into one document.

17.     The writers and Weisberg then meet in one of the writers' offices, where they review the complete Batch 1 together. At this stage, they read the jokes out loud, make tweaks to the language, and eliminate redundant jokes drafted by different writers—something that happens nearly every day.

18.     After this meeting, the Batch 1 jokes are printed and delivered to O'Brien, who reviews them and provides feedback via handwritten notes. O'Brien reviews the jokes in private, in his office, and the process usually takes 15-20 minutes.

19.     For jokes that are good enough to include in the monologue, he will draw a checkmark. For jokes that need improvement but show promise, he will draw a small squiggle. And for premises that seem promising but the jokes are not yet strong enough yet, he will write "GA" for "good area."

20.     O'Brien's notes are delivered back to Weisberg, who scans and distributes them to the writers, usually sometime between 1:00 and 1:45 p.m.

21.     By this time, the writers are usually at work on "Batch 2" of the monologue jokes. In "Batch 2," the writers incorporate O'Brien's feedback and attempt to write at least another 10 jokes. The writers may also draft fresh jokes based on new premises that they have discovered themselves or that the interns have found.

22.     The writers submit the Batch 2 jokes that they draft to Weisberg as they are written. That way, she can add them to the master document so that they are ready to print and review once O'Brien is finished with the afternoon's dress rehearsal.

DEFENDANTS' MEMORANDUM OF CONTENTIONS OF FACT AND LAW

1337195

23.     After finishing work on Batch 2, the monologue writers gather in O'Brien's dressing room along with O'Brien, Weisberg, and the head writer (Sweeney, at all times relevant to this lawsuit). This Batch 2 meeting usually happens between 2:00 and 2:45 p.m., approximately. Together, they review the jokes that have been added to the monologue from Batch 1, along with the new ones that have been drafted for Batch 2. During this Batch 2 meeting, a similar process takes place where the jokes are reviewed and evaluated as solid, promising, or "good areas."

24.     After the Batch 2 meeting in O'Brien's dressing room, the writers return to their offices to work on Batch 3 until about 3:40 p.m. During this time, they try to round out the monologue with jokes in "good areas" or improve jokes that are not quite good enough. They continue to submit jokes to Weisberg as they are written, who compiles them into a final document for review at the "Cue Card" meeting.

25.     The "Cue Card" meeting is where the jokes that have been selected for the monologue from Batch 1 and Batch 2, along with the new jokes from Batch 3, are written on cue cards for O'Brien to read aloud. This meeting takes place as O'Brien is in his makeup chair, starting at around 3:45 p.m. (The taping of each night's show begins at 4:30 p.m.) The Cue Card meeting is attended by the monologue writers, O'Brien, Weisberg, Sweeney, Ross, Andy Richter—O'Brien's longtime "sidekick"—and other *Conan* staff members.

26.     The monologue continues to undergo revision throughout the Cue Card meeting up until the time that the show is taped. Previously approved monologue jokes may be edited or removed until minutes before the show begins taping at 4:30 p.m.

27.     *Conan* has an informal policy to cut a joke from the monologue if it is discovered that the joke has already been told by someone else, even if the similarity is purely coincidental.

Glaser Weil

28.     Throughout the monologue writing process, the identities of the authors of individual jokes are known only to the authors themselves and Weisberg—the identities are obscured from O'Brien. Indeed, when the various batches of jokes are printed, the printouts contain only the text of the jokes and no identifying information about their authors. This is done so that the jokes are judged based on their merits alone. Maintaining the anonymity of the authors of the monologue jokes has the additional consequence of preventing monologue writers from feeling pressured to reach a certain quantitative output.

**C.     Kaseberg has accused Defendants of infringing his copyrights to five jokes, three of which remain at issue after summary judgment.**

29.     Over the course of this lawsuit, Kaseberg has accused O'Brien and Defendants of infringing his copyrights to five separate jokes by publicly performing allegedly similar jokes during O'Brien's nightly monologues.

**1.     The UAB Joke**

30.     Referred to as "Joke #5" in Plaintiff's Amended Complaint (Dkt. 58), the "UAB Joke" is the first joke that Kaseberg alleges O'Brien infringed.

31.     On December 2, 2014, Kaseberg posted the following joke on his blog: "The University of Alabama-Birmingham is shutting down its football program. To which the Oakland Raiders said, 'Wait, so you can do that?'"

32.     The following day, December 3, 2014, O'Brien told the following joke in his monologue: "Big news in sports. University of Alabama-Birmingham has decided to discontinue its football team. Yeah. When they heard this news, New York Jets fans said, 'Wait, can you do that? It's something you can do?'"

33.     This joke was initially created by monologue writer Brian Kiley at 11:32 a.m. on December 3, 2014.

34.     Kaseberg contends that he did not view O'Brien's version of the UAB Joke at or near the time that it aired. He did not allege infringement of the UAB Joke in his original complaint, filed on July 22, 2015.

1337195

Glaser Weil

35.     The alleged infringement of the UAB Joke was raised by Kaseberg's counsel during this litigation and was included in the Amended Complaint filed on October 4, 2016. (Dkt. 58.)

36.     In its Order (Dkt. 131) on Defendants' Motion for Summary Judgment, this Court held that "there is no genuine dispute of material fact regarding the UAB jokes' lack of virtual identity" and that "differences are significant enough to warrant summary judgment due to objective lack of virtual identity between the protectable elements of the allegedly infringing and allegedly infringed-upon joke. To hold otherwise would grant Plaintiff's UAB Joke the power to preclude any expression of disbelief and desire for a beloved but beleaguered sports team to also shut down their operations upon hearing the UAB news. This would fundamentally impede, rather than 'promote the progress of' the creative arts. U.S. Const. art. 1, § 8, cl. 8." (Dkt. 131 at 22.) The Court therefore granted summary judgment for Defendants regarding the UAB Joke.

## 2.     **The Delta Joke**

37.     Kaseberg posted his version of the "Delta Joke" (referred to as "Joke #1" in Plaintiff's Amended Complaint) to his blog at 4:14 p.m. on January 14, 2015: "A Delta flight this week took off from Cleveland to New York with just two passengers. And they fought over control of the armrest the entire flight."

38.     On the evening of January 14, 2015, O'Brien told the following "Delta Joke" in his monologue: "This never happens anymore. This is a strange story. On Monday, a Delta flight from Cleveland to New York took off with just two passengers. Two passengers on the whole plane. Yet somehow, they spent the whole flight fighting over the armrest. As if they wouldn't sit together, but they did. Everyone's ok."

39.     O'Brien's "Delta Joke" was created nearly five hours before Kaseberg posted his version of the joke: monologue writer Josh Comers submitted it via email at 11:33 a.m. on January 14, 2015.

Glaser Weil

40.     The Court thus held that "there is no genuine issue of material fact that Defendants created the Delta Joke prior to Plaintiff's version" and granted Defendants' Motion for Summary Judgment as to the Delta Joke. (Dkt. 131 at 12.)

41.     The Delta Joke was the first allegedly infringing joke that Kaseberg contends he observed in O'Brien's monologue at or near the time that it aired. (As discussed above, he contends that he did not learn of the alleged infringement of the UAB Joke until after filing this lawsuit.)

42.     Two days after O'Brien's Delta Joke aired, Kaseberg tweeted at Mike Sweeney, then-head writer on *Conan*, saying that he was "95% sure [he] had a joke from [his] blog used on the show. I'm not upset, [but] would like the opportunity to contribute jokes." Sweeney received the tweet at around the time that Kaseberg sent it, but did not respond.

### 3.     The Tom Brady Joke

43.     On February 3, 2015, Kaseberg posted the following "Tom Brady Joke" (referred to as "Joke #2" in his Amended Complaint) to Twitter at 8:49 a.m. and to his blog at 9:02 a.m.: "Tom Brady said he wants to give his MVP truck to the man who won the game for the Patriots. So enjoy that truck, Pete Carroll."

44.     Kaseberg's effective date of registration for his Tom Brady Joke is July 11, 2015.

45.     That evening, O'Brien told the following joke in his monologue: "Tom Brady said he wants to give the truck that he was given as Super Bowl MVP, give the truck to the guy who won the Super Bowl for the Patriots. Which is very nice. I think that's nice. I do. Yes. So Brady's giving his truck to Seahawks coach Pete Carroll."

46.     O'Brien's version of the Tom Brady Joke was written by monologue writer Brian Kiley and submitted via email at 3:14 p.m. on February 3, 2015.

DEFENDANTS' MEMORANDUM OF CONTENTIONS OF FACT AND LAW

47.     After seeing O'Brien's Tom Brady Joke, Kaseberg tweeted at one of *Conan*'s sketch writers, Andres de Bouchet, that the "Brady joke was on my blog Feb. 3 and on the monologue on Feb. 4. Any chance I can send jokes on my own as a freelancer?" De Bouchet brought this tweet to Sweeney's attention but did not respond to Kaseberg.

48.     Also at around this time, Kaseberg called Sweeney and left a message but did not receive a response.

### 4.     The Washington Monument Joke

49.     On February 17, 2015, Kaseberg posted the following "Washington Monument Joke" ("Joke #3" in the Amended Complaint) to Twitter at 7:21 a.m. and to his blog at 11:20 a.m.: "The Washington Monument is ten inches shorter than previously thought. You know the winter has been cold when a monument suffers from shrinkage."

50.     Kaseberg's effective registration date for his Washington Monument Joke is December 11, 2015.

51.     Later that evening, O'Brien told the following joke in his monologue: "Yesterday surveyors announced that the Washington Monument is ten inches shorter than what's been previously recorded. Yeah. Of course, the monument is blaming the shrinkage on the cold weather. Penis joke."

52.     This joke was written and submitted via email by monologue writer Brian Kiley at 1:23 p.m. on February 17, 2015.

53.     On February 18, 2015, the day after the Washington Monument Joke aired, Kaseberg again called Sweeney and reached him directly this time. During this call, Kaseberg expressed an interest in working for *Conan* in some capacity. Sweeney rejected Kaseberg's request for work.

54.     After the call, Kaseberg tweeted at Sweeney: "Thanks for taking my call. Last thing I wanted was to sound accusing. If there is any way I can contribute jokes, let me know."

55.     O'Brien also told a version of the Washington Monument Joke, during his January 9, 2014 monologue, over a year before Kaseberg created his version.

56.     The premise of the January 2014 Washington Monument Joke was: "The East Coast is starting to warm up. That's the good news. But it got very cold there for a while, especially in Washington, D.C. Record low temperatures this week. Check out this time-lapse footage of the cold front hitting the Washington Monument."

57.     A video clip then aired depicting the Washington Monument shrinking dramatically.

### 5.     The Jenner Joke

58.     Finally, Kaseberg posted the following "Jenner Joke" ("Joke #5" in his Amended Complaint) to his blog at 11:05 a.m. and to his Twitter at 11:31 a.m. on June 9, 2015: "Three towns, two in Texas, one in Tennessee, have streets named after Bruce Jenner and now they have to consider changing them to Caitlyn. And one will have to change from a Cul-De-Sac to a Cul-De-Sackless."

59.     Kaseberg's effective date of registration for his Jenner Joke is September 8, 2015.

60.     That evening, O'Brien told the following Jenner Joke in his monologue: "Some cities that have streets named after Bruce Jenner are trying to change the streets' names to Caitlyn Jenner. If you live on Bruce Jenner cul-de-sac it will now be cul-de-no-sack."

61.     O'Brien's version of the Jenner Joke was submitted via email by monologue writer Rob Kutner at 1:34 p.m. on June 9, 2015.

## II.     Contentions of Law

### A.     Kaseberg cannot prove either ownership of a valid copyright or infringement by Defendants.

62.     Plaintiff's original complaint was filed on July 22, 2015.

1337195

63.    Kaseberg can prevail on his copyright infringement claim only if he can "prove both valid ownership of the copyright and infringement of that copyright by the alleged infringer." *Ent. Research Grp., Inc. v. Genesis Creative Grp.*, 122 F.3d 1211, 1217 (9th Cir. 1997) (citations omitted).

### 1.    <u>Kaseberg's jokes lack the minimal level of originality required to enjoy copyright protection.</u>

64.    Kaseberg's infringement claim must fail because his asserted jokes lack the requisite originality to warrant copyright protection. Originality is a prerequisite to copyrightability. *Kamar Intern., Inc. v. Russ Berrie and Co.*, 657 F.2d 1059, 1061 (9th Cir. 1981).

65.    Expressions that are "standard, stock, or common to a particular subject matter or medium are not protectable under copyright law." *Satava v. Lowry*, 323 F.3d 805, 810 (9th Cir. 2003), *cert. denied* 540 U.S. 983 (2003).

66.    To be copyrightable, an expression must be original, i.e., "must be something more than a 'merely trivial' variation" on a standard form. *Id.*

67.    Copyright does not protect ideas, but only the original expression of such ideas. 17 U.S.C. § 102(b); *Rice v. Fox Broad. Co.*, 330 F.3d 1170, 1174 (9th Cir. 2003).

68.    For Kaseberg's jokes to be considered original work they must have been created (1) independently by Kaseberg (i.e. he did not copy the jokes from another work) and (2) by use of at least minimal creativity. *See* Ninth Circuit Model Civil Jury Instructions, 17.14 (2017).

69.    "Although the amount of creative input by the author required to meet the originality standard is low, it is not negligible. There must be something more than a 'merely trivial' variation, something recognizably the artist's own." *Satava*, 323 F.3d at 810 (citations omitted).

Glaser Weil

70.     Kaseberg's jokes are negligible and trivial variations on unprotectable ideas, preexisting works, or public domain works, such that they do not contain the requisite amount of creative input to qualify for copyright protection.

### 2.     If copyrightable, Kaseberg's jokes are entitled only to thin protection against virtually identical copying.

71.     If Kaseberg is found to have made original contributions to his jokes, those original contributions are entitled only to "thin" copyright protection. *Satava*, 323 F.3d at 812.

72.     This Court held that "Plaintiff's jokes are entitled to only 'thin' copyright protection" in its Order (Dkt. 131 at 21) on Defendants' Motion for Summary Judgment, observing that "although the punchlines of the jokes are creative, they are nonetheless constrained by the limited number of variations that would (1) be humorous (2) as applied to the specific facts articulated in each joke's previous sentence and (3) provide mass appeal. This merits only thin protection. The standard for infringement must therefore also be some form of 'virtual identity.'"

73.     Thin copyright protection protects against only virtually identical copying. *Id.*; *see also Ets–Hokin v. Skyy Spirits, Inc.,* 323 F.3d 763, 766 (9th Cir. 2003) ("When we apply the limiting doctrines, subtracting the unoriginal elements, Ets Hokin is left with ... a 'thin' copyright, which protects against only virtually identical copying."); *Apple Computer, Inc. v. Microsoft Corp.*, 35 F.3d 1435, 1439 (9th Cir. 1994) ("When the range of protectable and unauthorized expression is narrow, the appropriate standard for illicit copying is virtual identity.").

### 3.     Kaseberg cannot prove that his jokes were copied by Defendants, either directly or indirectly.

74.     Kaseberg lacks any direct evidence of copying of his jokes by Defendants.

Glaser Weil

75.     Without direct evidence of copying, for Kaseberg to prove copying by Defendants, he must prove that (1) Defendants had access to the allegedly infringed-upon jokes and (2) that the allegedly infringed-upon jokes and Defendants' allegedly infringing jokes are virtually identical. *See, e.g.*, *Rice v. Fox Broad. Co.*, 330 F.3d at 1174 (noting copying "may be established by showing that . . . [(1)] the infringing party 'had access' to the copyrighted work" and "[(2)] the works in question 'are substantially similar in their protected elements'" (quoting *Metcalf v. Bochco*, 294 F.3d 1069, 1072 (9th Cir. 2002))).

**a.     Kaseberg cannot prove that Defendants had a reasonable opportunity to view his jokes.**

76.     Proof of access requires "an opportunity to view or to copy plaintiff's work." *See Sid & Marty Krofft Television Prods., Inc. v. McDonald's Corp.*, 562 F.2d 1157, 1172 (9th Cir. 1977); *see also Art Attacks Ink, LLC v. MGA Entm't Inc.*, 581 F.3d 1138, 1143 (9th Cir. 2009) (requiring "a reasonable possibility, not merely a bare possibility").

77.     Access may be shown by (1) a chain of events connecting the plaintiff's work and the defendant's opportunity to view that work, (2) the plaintiff's work being widely disseminated, or (3) a similarity between the plaintiff's work and the defendant's work that is so "striking" that it is highly likely the works were not created independent of one another. *See* Ninth Circuit Model Civil Jury Instructions, 17.18 (2017).

**(i)     Kaseberg cannot prove a chain of events linking his jokes to *Conan*'s monologue writers.**

78.     Kaseberg cannot show a chain of events linking the jokes posted on his blog or Twitter account and the *Conan* monologue writers who authored the allegedly infringing jokes at issue.

79.     Kaseberg has no evidence that Comers, Kiley, or Kutner ever visited his blog or his Twitter account before this lawsuit was filed.

Glaser Weil

80.     Indeed, Comers, Kiley, and Kutner deny having heard of Kaseberg or having viewed Kaseberg's blog or Twitter account before learning about his accusations of joke theft.

81.     Furthermore, Kaseberg cannot establish the requisite chain of events where his jokes were merely displayed on the Internet, and there is no direct evidence that a Defendant actually visited the website. *See, e.g.*, *Bldg. Graphics, Inc. v. Lennar Corp.*, 708 F.3d 573, 580 (4th Cir. 2013) (finding that mere existence of a copyrighted work online is insufficient to support an inference that the work fell into the defendant's hands); *Chafir v. Carey*, 2007 WL 2702211, at *3 (S.D.N.Y. Sept. 17, 2007) ("[T]he fact that Plaintiff's Song was available on a publicly accessibly [sic] website does not prove access, because there is no evidence that Defendants actually visited the website on which Plaintiff's Song was posted.").

**(ii)     <u>Kaseberg's jokes were not widely disseminated.</u>**

82.     Kaseberg cannot establish that his jokes were widely disseminated.

83.     Merely having an online presence is insufficient to establish widespread dissemination. *See, e.g.*, *Art Attacks*, 581 F.3d at 1144 (recognizing that while the Internet can reach a wide audience, there must be evidence to demonstrate wide dissemination); *Stabile v. Paul Smith Ltd.*, 137 F. Supp. 3d 1173, 1187 (C.D. Cal. 2015) (finding that "simply displaying an image on [plaintiff's] website for an undeterminable period of time is insufficient to demonstrate that it was widely disseminated").

84.     "[T]he public dissemination necessary to infer that a defendant might have had access to the work is considerable." *Loomis v. Cornish*, 2013 WL 6044345, at *10 (C.D. Cal. Nov. 13, 2013).

85.     Kaseberg has failed to produce any evidence, such as records reflecting hits to his website or Twitter account, to establish that his blog posts or tweets are widely disseminated.

86.     The three jokes that Kaseberg posted to Twitter show very little audience engagement or dissemination (in the form of likes or retweets), if any. The Tom Brady Joke received no more than two likes and zero retweets at the time of the alleged infringement. The Washington Monument joke received zero likes and zero retweets at the time of the alleged infringement. And the Jenner Joke received zero likes and zero retweets at the time of the alleged infringement.

> **(iii)   Kaseberg's jokes are not strikingly similar to those told on _Conan_.**

87.     The jokes at issue are not strikingly similar such that the similarity reasonably precludes the possibility of any explanation other than copying. As discussed in §§ II.A.3.b and c, below, the jokes differ in significant ways, including in their structure, delivery, and wording.

88.     For similarities to be "striking" as a matter of law, they "should appear in sufficiently unique or complex context as to make it unlikely that both pieces were copied from a prior common source, or that the defendant was able to compose the accused work as a matter of independent creation." _Selle v. Gibb_, 741 F.2d 896, 904 (7th Cir. 1984) (citations omitted) (discussing striking similarity in the context of musical compositions).

> **b.     Kaseberg cannot prove that the jokes on _Conan_ are virtually identical to his.**

89.     Kaseberg cannot prove that the jokes at issue are virtually identical.

90.     As discussed above, this Court held that Kaseberg's jokes are entitled only to thin copyright protection, such that the standard for infringement is virtual identity. (Dkt. 131 at 21.)

91.     The setups or premises of the jokes at issue consist of facts, which are not copyrightable. _Feist Publ'ns, Inc. v. Rural Tel. Serv. Co._, 499 U.S. 340, 344 (1991) ("That there can be no valid copyright in facts is universally understood.").

92.    The punchlines of the jokes at issue are "constrained by the limited number of variations that would (1) be humorous (2) as applied to the specific facts articulated in each joke's previous sentence and (3) provide mass appeal." (Dkt. 131 at 21.)

93.    A comparison of the jokes demonstrates that any similarities are limited to unprotectable ideas and unoriginal comedic conventions, which cannot give rise to infringement. *Data East USA, Inc. v. Epyx, Inc.*, 862 F.2d 204, 208 (9th Cir. 1988) ("[T]o the extent the similarities between plaintiff's and defendant's works are confined to ideas and general concepts, these similarities are noninfringing.").

94.    Defendants may move *in limine* to exclude the testimony of Kaseberg's purported expert witness on the subjects of substantial similarity and virtual identity, Elayne Boosler, in accordance with the procedures required by the local rules.

### c.    The jokes on *Conan* differ substantially from Kaseberg's in the specific expressions used.

95.    In contrast, substantial differences exist as to the particular expression of the jokes at issue.

96.    Among other distinguishing factors in the expression, the parties' jokes are worded differently, convey different actions, contain different levels of information, and involve different perspectives.

97.    The structure of the jokes are different in part because the jokes were intended to be delivered to their respective audiences in different mediums.

98.    In particular, Kaseberg wrote and published his jokes to be read online.

99.    As such, Kaseberg's jokes follow the same, two-sentence, setup-punchline format, which is concisely digestible to a passive, solitary audience.

100.    In contrast, Defendants' jokes are performed on stage by O'Brien, delivered to an audience.

101.    The *Conan* monologue writers craft the jokes with that distinction in mind.

102.   Thus, the structure and delivery of the jokes on *Conan* are more conversational in nature and often include improvised or ad-libbed language based on the audience's reaction.

103.   Defendants' jokes are structured so that the jokes will get the biggest laugh from the studio audience in the moment.

104.   Further, millions of people have a familiarity with O'Brien and the writers take care to craft jokes that are consistent with his voice and his brand.

### (i)      The Tom Brady Joke

105.   Regarding the Tom Brady Joke, Defendants' Tom Brady Joke makes two references to "Super Bowl" in the setup alone. Kaseberg's Tom Brady Joke fails to use the term "Super Bowl" at all. Instead, it makes a single reference to the "game." Defendants' setup also makes clear that Tom Brady was given the truck for earning the honor of Super Bowl MVP. Kaseberg's joke mentions the "MVP truck" with no reference to the Super Bowl or how the truck was Brady's to give away.

106.   O'Brien elaborates on the joke's setup by twice mentioning how nice it is for Tom Brady to give the truck away. Kaseberg's joke contains no similar reference or segue. O'Brien responds to the audience's reaction midstream (saying "I do" and "yes") before delivering the punchline. Kaseberg's joke has no such language.

107.   Moreover, Kaseberg's punchline reads "enjoy the truck Pete Carroll." In contrast, Defendants' punchline reads "So, Brady is giving his truck to Seahawks coach Pete Carroll." Defendants' Tom Brady Joke specifically identifies Pete Carroll as the Seahawks coach. Kaseberg's does not. Kaseberg's Tom Brady Joke also sarcastically tells Pete Carroll to "enjoy" the truck, whereas Defendants' joke is expressed in a more neutral tone. Finally, in Kaseberg's Tom Brady Joke, the audience must infer that the truck was given to Pete Carroll. Defendants' joke explicitly says Tom Brady gave the truck to Pete Carroll.

**(ii)** **The Washington Monument Joke**

108.   Regarding the Washington Monument Joke, Kaseberg's setup reads: "The Washington Monument is ten inches shorter than previously thought." Notably, this exact phrasing was used in a tweet by Jimmy Fallon the day before Kaseberg's publication. Conversely, Defendants' premise reads: "Yesterday, surveyors announced that the Washington Monument is ten inches shorter than what's been recorded." This phrasing offers more specific information—*i.e.*, when and how it was discovered the monument was shorter, and who made the discovery. Kaseberg's setup does not offer any of these details. The setups are further distinguishable, as Defendants' joke makes clear the monument is shorter than what had been "previously *recorded*," while Kaseberg uses the language "previously *thought*." In the middle of Defendants' joke, O'Brien again inserts a "yeah." Kaseberg's joke does not.

109.   Defendants' punchline anthropomorphizes the Washington Monument, suggesting that the monument itself blamed the "shrinkage" on the cold weather. In contrast, Kaseberg's joke presents the punchline from an outside perspective, stating that, "You know the winter has been cold when a monument suffers from shrinkage." Beyond the objective differences in the wording of the punchlines, the punchlines are suggesting different things. In saying that the monument blamed the colder weather for the "shrinkage," Defendants' joke suggests that the other factors could be to blame. In contrast, Kaseberg's joke explicitly provides that the shrinkage is indeed the result of cold weather. Kaseberg's joke mentions the winter has been cold, where Defendants' references the cold weather—untethered to any season. Finally, O'Brien concludes his joke noting it was a "penis joke." Kaseberg ends his joke with the shrinkage punchline.

DEFENDANTS' MEMORANDUM OF CONTENTIONS OF FACT AND LAW

1337195

### (iii)    The Jenner Joke

110.    Regarding the Jenner Joke, Kaseberg's premise specifically identifies *three* towns which have streets named after Bruce Jenner. In contrast, Defendants' setup only mentions that "some cities have streets named after Bruce Jenner." Kaseberg's joke says the towns "*have to consider changing* the name to Caitlyn." Defendants' joke says that cities are actively "*trying to change* the streets' name to Caitlyn *Jenner*"—including "Jenner" where Kaseberg did not.

111.    Further, Kaseberg's punchline states that one street will "have to change from a Cul-De-Sac to a *Cul-de-Sacless*." Defendants' joke says that "*Bruce Jenner* Cul-De-Sac . . . will be now *cul-de-no-sac*"—ending the joke on the hard "k" sound. Moreover, Defendants' joke is directed to residents of the street, specifically introducing the punchline with the phrase "If you live on Bruce Jenner Cul-de-Sac…" Kaseberg's joke has no such preamble to his punchline.

112.    In summary, no reasonable juror could conclude that the jokes at issue are virtually identical in total concept and feel.

### 4.    *Conan*'s monologue writers independently created each of the allegedly infringing jokes.

113.    Finally, each of the allegedly infringing jokes at issue was independently created by the *Conan* monologue writers.

114.    The three monologue writers that created the allegedly infringing jokes all declared, under penalty of perjury, that they did not copy Kaseberg's jokes. None of them had ever heard of Kaseberg, visited Kaseberg's blog or Twitter page, or seen any of Kaseberg's jokes at issue prior to the alleged infringement. Despite 11 depositions, none of Defendants' witnesses testified to having even heard of Kaseberg, much less viewing his blog, Twitter page, or the jokes at issue, prior to learning about Kaseberg's accusations. Moreover, all communications between Comers, Kiley, Kutner, and Weisberg for the days at issue were produced. None of those communications mention Kaseberg or his material.

115.   The monologue writers that created Defendants' jokes do not perform general online searches, look at other comics' material, or visit social media to perform their premises research. Their limited research is restricted to a handful of specific news outlets they prefer, and is solely to gather factual premises—not to gain inspiration for punchlines. This makes it virtually impossible for any writer, much less three separate writers, to have stumbled onto Kaseberg's jokes for source material—especially given the limited reach of his posts and the nonexistent awareness of his platforms.

116.   *Conan*'s monologue writers have no incentive to copy or steal jokes, given *Conan*'s submission protocol. There is no requirement that a writer submit a minimum number of jokes for the monologue each day. Nor is there any requirement that a show's monologue must feature a certain number of jokes. Monologue jokes are reviewed anonymously. There is no attribution as to individual monologue jokes, and the show does not keep track of a particular monologue writer's submissions. Because of this process, the monologue submissions of any writer do not, and could not, factor in to their standing at the show—including decisions regarding retention, termination, or compensation.

117.   *Conan's* monologue writers have good reason to deliberately avoid copying material. O'Brien, Sweeney, Comers, Kutner and Kiley all testified that stealing jokes is an unacceptable practice. Consistent with this view, *Conan* has an informal policy in place where monologue jokes will be pulled if it is ever discovered that they are similar to a joke told by anyone else, even if the similarity is purely coincidental. As such, it simply does not follow that O'Brien, or his writers, would risk their reputations, and potentially their careers, to search out and copy Kaseberg's jokes for use on the show.

118.   Further, any similarities between the parties' jokes are attributable to the nature of the jokes themselves. Because premises to monologue-style jokes derive from current events and news stories, countless people (other late-night hosts, individuals on social media, etc.) are all creating jokes derived from the same starting point. As such, it is inevitable that multiple parties will, at times, also arrive at the same end point to a joke, independent of one another.

119.   The jokes at issue in this case are particularly susceptible to overlap due to parallel thought. Indeed, numerous people posted jokes similar to each of Kaseberg's allegedly infringed-upon jokes on social media—all before Kaseberg's publications. Defendants have gathered and produced numerous examples of social media users commenting that Tom Brady should have given his MVP truck to Pete Carroll instead of Malcolm Butler, that the Washington Monument was suffering from "shrinkage," and that culs-de-sac named after Bruce Jenner would require renaming.

120.   Beyond the jokes at issue in this action, Defendants have produced numerous examples of parallel thought occurring between jokes told on *Conan* or drafted by *Conan*'s writers and jokes Kaseberg posted on his blog or Twitter. These include jokes on subjects varying from Donald Trump and his advisers, to the Bachelorette, to the Michael Dell biopic, to the Facebook "dislike" button, to writing the wrong name on checks in February, to Kid Rock, to Kim Kardashian, to North Korea, to the Pope, and to Captain Sully Sullenberger. In each of these instances, *Conan*'s joke was created first. Assuming Kaseberg did not copy these jokes, these examples further demonstrate that similarities among jokes by Kaseberg and Defendants are a result of parallel thought, as opposed to deliberate copying.

121.   Additionally, overlap between the parties' jokes can be attributed to Kaseberg's repeated and deliberate efforts to imitate the monologue jokes featured in late-night shows, including *Conan*.

Glaser Weil

122.   Finally, parallel thought is an innate reality in the world of late-night talk shows and monologue jokes. Indeed, *Conan's* writers testified to this being a frequent occurrence among their own staff, and to having personal experience with it happening among other shows.

123.   Defendants may move *in limine* to exclude the testimony of Kaseberg's purported expert witness on the subject of independent creation, David Barsky, in accordance with the procedures required by the local rules.

### 5.   Kaseberg will be unable to prove direct copyright infringement by Time Warner or TBS.

124.   Kaseberg's Amended Complaint (Dkt. 58) states no cause of action for vicarious or contributory copyright infringement; it only makes a claim for direct copyright infringement. *See* Dkt. 58 at ¶¶ 28-34.

125.   Kaseberg will be unable to prove that Time Warner or TBS are the cause of the alleged infringement. *See* Ninth Circuit Model Civil Jury Instructions, 17.5 (2017) (*citing Perfect 10, Inc. v. Giganews, Inc*., 847 F.3d 657, 666 (9th Cir. 2017) ("where it is clear that infringement has occurred, courts must determine 'who is close enough to the [infringing] event to be considered the most important cause'" (citation omitted))).

### B.   Kaseberg is entitled to a minimal award of damages and fees, if any.

### 1.   Kaseberg cannot prove that the alleged infringement of any of his jokes was willful.

126.   The Copyright Act provides additional remedies if the plaintiff can show that the violation was willful. *See* 17 U.S.C. § 504(c)(2).

127.   To prove willfulness, "the plaintiff must show (1) that the defendant was actually aware of the infringing activity, or (2) that the defendant's actions were the result of 'reckless disregard' for, or 'willful blindness' to, the copyright holder's rights." *Wash. Shoe Co. v. A-Z Sporting Goods Inc*., 704 F.3d 668, 674 (9th Cir. 2012).

128.   Kaseberg will be unable to prove that any of *Conan*'s monologue writers were aware of him or his jokes before the time of the alleged infringements. Accordingly, Kaseberg will be unable to prove that any Defendant was actually aware of any infringing activity or that they acted with reckless disregard for Kaseberg's rights.

### 2.   Kaseberg's actual damages are minimal at best, and Kaseberg's disgorgement-of-profits theory is remote and speculative.

129.   For demonstrated copyright infringement, a plaintiff may seek an award of actual damages caused by the infringement and any additional profits of the infringer caused by the infringement that are not incorporated into the calculation of actual damages. 17 U.S.C. § 504(b).

130.   To the extent that Kaseberg can recover actual damages, these damages are minimal, at best. In discussing damages, Defendants have avoided using specific dollar amounts, as much of that information has been designated "Confidential" or "Highly Confidential – Attorneys' Eyes Only" under the Protective Order. (Dkt. 48.) Defendants will meet and confer with opposing counsel to discuss to what extent such designations can be withdrawn in advance of trial.

131.   Kaseberg's actual damages, if recoverable, are appropriately limited to the maximum amount that he can prove that he has sold a single monologue-style joke multiplied by the number of jokes found to infringe.

132.   Furthermore, Kaseberg cannot establish "the existence of a causal link" between the alleged infringement and Defendants' profits necessary to prove his entitlement to recovery under a disgorgement-of-profits theory. *Mackie v. Rieser,* 296 F.3d 909, 911 (9th Cir. 2002) ("When an infringer's profits are only remotely and speculatively attributable to the infringement, courts will deny recovery to the copyright owner.").

133.   Even assuming Kaseberg could establish the requisite "causal link," which he cannot, Kaseberg's damages expert, John H. Reith, opined that Kaseberg was entitled to a minimal amount of damages based on the gross revenues attributable to all purportedly infringing materials—including the UAB Joke and Delta Joke, which the Court has determined did not infringe Kaseberg's copyrights.

134.   Additionally, Reith's testimony should be excluded as it incorrectly addresses only Defendants' revenues, not profits. Defendants may move *in limine* to exclude Reith's testimony in accordance with the procedures required by the local rules.

        **3.**      **<u>Kaseberg cannot recover statutory damages or attorney's fees for two of the three jokes at issue, and Defendants intend to seek their fees to the fullest extent possible if they prevail at trial.</u>**

135.   As an alternative to actual damages, the Copyright Act authorizes an award of statutory damages under certain circumstances. 17 U.S.C. § 504(a) & (c).

136.   Federal copyright law limits the availability of statutory damages and attorneys' fees as remedies for copyright infringement. 17 U.S.C. § 412.

137.   In relevant part, 17 U.S.C. § 412 provides that "[i]n any action under this title, … no award of statutory damages or of attorney's fees, as provided by sections 504 and 505, shall be made for … any infringement of copyright commenced after first publication of the work and before the effective date of its registration, unless such registration is made within three months after the first publication of the work."

138.   To the extent any of Kaseberg's copyrights are deemed valid, and he is entitled to statutory damages at all, no such relief is available for the Tom Brady Joke or the Washington Monument Joke.

139.   The Tom Brady Joke was first published on February 3, 2015, but its effective date of registration is July 11, 2015—over three months after first publication. Therefore, Kaseberg is precluded form recovering statutory damages or attorney's fees for the Tom Brady Joke.

140.   The Washington Monument Joke was published on February 17, 2015, but its effective date of registration is December 11, 2015—over three months after first publication. Therefore, Kaseberg is precluded from recovering statutory damages or attorney's fees for the Washington Monument Joke.

141.   Furthermore, to the extent that Kaseberg is eligible to recover statutory damages or attorney's fees for the Jenner Joke, these awards should be minimal.

142.   "Statutory damages further compensatory and punitive purposes, and help sanction and vindicate the statutory policy of discouraging infringement. If statutory damages are elected, the jury has wide discretion in determining the amount of statutory damages to be awarded, constrained only by the specified maxima and minima. The jury is guided by what is just in the particular case, considering the nature of the copyright, the circumstances of the infringement and the like." *Dream Games of Ariz., Inc. v. PC Onsite*, 561 F.3d 983, 992 (9th Cir. 2009) (citations, internal quotation marks, and alterations omitted).

143.   Defendants will argue, given the purposes of statutory damages, that a minimal award—if any award is appropriate—is all that is needed to compensate Kaseberg and discourage infringement.

144.   "In any civil action under this title, the court in its discretion may allow the recovery of full costs by or against any party other than the United States or an officer thereof. Except as otherwise provided by this title, the court may also award a reasonable attorney's fee to the prevailing party as part of the costs." 17 U.S.C. § 505.

145.   "In deciding whether to award fees under the Copyright Act, the district court should consider, among other things: the degree of success obtained on the claim; frivolousness; motivation; objective reasonableness of factual and legal arguments; and need for compensation and deterrence." *Maljack Prods., Inc. v. GoodTimes Home Video Corp.*, 81 F.3d 881, 889 (9th Cir. 1996)

146.   The factors listed in *Maljack* favor a minimal fee award, if any, in the event that Kaseberg prevails on his claim regarding the Jenner Joke.

147.   On the other hand, should Defendants prevail, they will seek their attorney's fees to the fullest extent possible. *See id.* at 889 ("The same standard applies to both prevailing defendants and plaintiffs.").

## C.   Injunctive relief is unwarranted in this action.

148.   If Kaseberg is able to establish liability, a permanent injunction would be unnecessary and unwarranted.

149.   A court may "grant temporary and final injunctions on such terms as it may deem reasonable to prevent or restrain infringement of a copyright," 17 U.S.C. § 502(a), and "[a]s a general rule, a permanent injunction will be granted when liability has been established and there is a threat of continuing violations." *MAI Sys. Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 520 (9th Cir. 1993).

150.   Assuming he is able to prove liability, Kaseberg will be unable to prove that there is a threat of continuing violations of his copyrights.

* * *

151.   If it should be determined that any of these Contentions of Law should have been set forth as Contentions of Fact, or vice versa, Defendants respectfully request that they be deemed as such.

## III.   Abandoned Issues

This Court held in its Summary Judgment Order (Dkt. 131) that Defendants do not infringe Kaseberg's copyrights to the UAB Joke and the Delta Joke.

1337195

Defendants have abandoned the following affirmative defenses: (1) Failure to State a Claim, and (2) Improper Venue.

The Court dismissed Defendants' affirmative defenses of Fraud on the Copyright Office and Unclean Hands in its November 15, 2018 Order. (Dkt. 173.)

The only other abandoned issues are those relating to the UAB Joke and the Delta Joke, which were extinguished by the Court's ruling granting partial summary judgment in favor of Defendants.  *See* Dkt. 131.

**IV.**    **Rule 16.1(f)(2)(a) Exhibits**

Defendants' Exhibit List is being filed concurrently.

**V.**    **Rule 16.1(f)(1)(a) Witnesses**

Defendants' Witness List is being filed concurrently.

DATED:  January 24, 2019           GLASER WEIL FINK HOWARD
                                              AVCHEN & SHAPIRO LLP


                                      By:   */s/ Thomas P. Burke Jr.*
                                      PATRICIA L. GLASER
                                      THOMAS P. BURKE JR.
                                      JUSTIN P. THIELE
                                           Attorneys for Defendants

DEFENDANTS' MEMORANDUM OF CONTENTIONS OF FACT AND LAW

1337195